United States Court of Appeals,

Fifth Circuit.

No. 95-60699.

SNAP-DRAPE, INC., Petitioner-Appellant,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellee.

Oct. 28, 1996.

Appeal from the United States Tax Court.

Before KING, SMITH and WIENER, Circuit Judges.

WIENER, Circuit Judge:

This federal income tax case presents two questions: (1) whether Treasury Regulation § 1.56(g)-1(d)(3)(iii)(E) is valid to the extent it provides that dividends paid to an Employee Stock Ownership Plan and deductible for regular income tax purposes, cannot be deducted in calculating earnings and profits (E & P) and thus in computing "adjusted current earnings" (ACE) for purposes of the corporate alternative minimum tax (AMT); and (2) if valid, whether retroactive application of that regulation was proper. The Tax Court concluded that the regulation in question is valid and that the Secretary of the Treasury had not abused his discretion in failing to limit the subject regulation's effect to prospective only. Agreeing with the Tax Court that the regulation is valid and that its retroactive application is not inappropriate, we affirm.

I

FACTS AND PROCEEDINGS

Petitioner-Appellant Snap-Drape, Inc. (Taxpayer) is a Texas corporation engaged principally in manufacturing and marketing table skirting for buffet tables, banquet tables, conference tables, and the like. Prior to February 1990, the founders of Taxpayer—Raymond Belknap and Gerald Guebert—owned, in equal portions, all of the outstanding common stock of the corporation.

In late 1988 or early 1989, Belknap and Guebert decided to sell their interests in Taxpayer

1

and retire. The two founders explored a number of ways to dispose of their stock, none of which proved to be satisfactory. In November 1989, Belknap and Guebert began serious consideration of creating an employee stock ownership plan to which they could sell their stock. Uncontradicted testimony in the record reflects that the plans of Belknap and Guebert were well underway prior to the December 19, 1989 enactment date of the Omnibus Budget Reconciliation Act of 1989 (OBRA),[1] not to mention the issuances of the proposed and final versions of the subject regulation.

On February 1, 1990, Taxpayer established the Snap-Drape, Inc. Employee Stock Ownership Plan and Trust (the ESOP). Later that same month, the ESOP agreed to purchase approximately 80 percent of Belknap's and Guebert's Snap-Drape common stock for a total of $5,000,000. To make this stock purchase possible, the ESOP obtained a $5,000,000 bank loan which Taxpayer was required to guarantee. The reason that the ESOP purchased no more than 80 percent of Taxpayer's issued and outstanding stock was that the bank refused to finance a larger purchase: An analysis of Taxpayer's cash flow indicated that $5,000,000 was the maximum amount of debt that the corporation could service, and then only if the note payments could be made with "pre-tax dollars."

Among other things, the ESOP's note to the bank provides for mandatory annual prepayments of principal. The amount of each such prepayment is to be calculated by a formula based on Taxpayer's cash flow.

During its 1990 taxable year, Taxpayer made a qualifying contribution of $240,732 to the ESOP. An income tax deduction for this entire amount was taken pursuant to I.R.C. § 404(a); it was the maximum contribution that Taxpayer could make to such a plan that year and still obtain a tax deduction. In addition, however, Taxpayer paid $1,440,000 in cash as dividends on the shares of its stock held by the ESOP.[2] In turn, the ESOP used funds received as dividends to make payments on the loan that it had taken out to acquire the stock, so Taxpayer was permitted to deduct the

---

[1]P.L. No. 101-239, 103 Stat. 2106 (1989).

[2]In the agreement to sell their stock to the ESOP, Belknap and Guebert agreed to waive all dividends on the stock that they retained until such time as the ESOP's note was paid in full. Accordingly, no dividends were paid to Belknap or Guebert in 1990.

$1,440,000 from its taxable income pursuant to I.R.C. § 404(k).[3]  In computing its AMT, Taxpayer made no adjustment with respect to either the § 404(k) dividends or the § 404(a) contribution to the ESOP.  Accordingly, Taxpayer reported on its 1990 income tax return that it was not liable for any AMT.

On May 3, 1990—a few months *after* Taxpayer formed the ESOP, and *after* the ESOP entered into both the stock purchase and the loan agreements—the Treasury Department published a proposed regulation that for the first time ever would disallow a deduction for § 404(k) dividends for purposes of determining corporate earnings and profits (E & P) as used in computing ACE under the corporate AMT regime.  Almost a year later, on March 15, 1991, Treasury Regulation § 1.56(g)-1(d)(3)(iii)(E) was published in final form, effective retroactively for all taxable years beginning after December 31, 1989.  As Taxpayer's taxable year is the calendar year, retroactivity would cause that regulation to affect Taxpayer for 1990.

Based on the authority of this regulation, Respondent-Appellee Commissioner of Internal Revenue (the Commissioner) applied it retroactively and determined that Taxpayer incorrectly computed its alternative minimum taxable income (AMTI) and owed $210,613 in AMT for its 1990 tax year.  Taxpayer challenged the Commissioner's determination in the Tax Court, objecting to the validity of the regulation and its retroactive application.

In support of its position that § 404(k) dividends are properly deductible in computing ACE, Taxpayer sought to introduce two expert witness reports that reach this same conclusion.  The Tax Court, however, did not admit these reports into evidence as it determined that the reports contained legal rather than factual conclusions.  The Tax Court went on to hold that the regulation in question was valid and that its retroactive application was proper.  Taxpayer now appeals.

II

ANALYSIS

---

[3]*See* I.R.C. § 404(k)(2)(A)(iii).  The mandatory prepayment of principal due under the ESOP's note for 1990 was $569,123.

A. STANDARD OF REVIEW

The decision whether to admit expert testimony is entrusted to the sound discretion of the trial court. Such an evidentiary ruling is reversible on review only for an abuse of that discretion.[4]

In assessing the validity of a Treasury regulation, the standard of review depends on whether the regulation is legislative or interpretive. A legislative regulation is given controlling weight unless it is "arbitrary, capricious, or manifestly contrary to the statute."[5] An interpretive regulation, on the other hand, is accorded less deference, but is nevertheless valid if it is a reasonable interpretation of the statute and if it "harmonizes with the plain language of the statute, its origin, and its purpose."[6]

Failure of the Secretary of the Treasury to limit a regulation to prospective application is reviewable for an abuse of discretion.[7]

B. EXCLUSION OF EXPERT WITNESS REPORTS FROM EVIDENCE

Both of the two expert witness reports offered by Taxpayer, which the Tax Court refused to admit into evidence, are in the form of letters from certified public accountants and contain analyses that lead to the conclusion that § 404(k) dividends are deductible for purposes of computing ACE. Each report also concludes that the position taken by the Treasury Department in Regulation § 1.56(g)-1(d)(3)(iii)(E) was not reasonably foreseeable before it was published in proposed form on May 3, 1990.

In refusing to admit these expert witness reports into evidence, the Tax Court determined that they improperly contain legal conclusions and statements of mere advocacy. The Tax Court further concluded that the reports would be of no assistance in making findings of fact.

---

[4]*United States v. Charroux,* 3 F.3d 827, 833 (5th Cir.1993).

[5]*Dresser Indus. v. Commissioner,* 911 F.2d 1128, 1137 (5th Cir.1990) (citing *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 844, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984)).

[6]*Id.* at 1137-38 (quoting *Rowan Companies v. United States,* 452 U.S. 247, 252, 101 S.Ct. 2288, 2292, 68 L.Ed.2d 814 (1981)).

[7]*Anderson, Clayton & Co. v. United States,* 562 F.2d 972, 979 (5th Cir.1977), *cert. denied,* 436 U.S. 944, 98 S.Ct. 2845, 56 L.Ed.2d 785 (1978).

Taxpayer asserts on appeal that the two expert witness reports should have been admitted as they show (1) the proper treatment of § 404(k) dividends for tax accounting purposes and (2) the reasonable reliance by Taxpayer on its tax advisors at the time that it entered into the ESOP transaction, months before publication of the proposed regulation. Taxpayer further asserts that, as Federal Rule of Evidence 704(a) supports the admission of these reports, the Tax Court abused its discretion in refusing to admit them into evidence. We disagree.

The Tax Court accurately described the expert witness reports at issue as consisting of nothing more than legal arguments. We must conclude, therefore, that Taxpayer's reliance on Rule 704(a) is misplaced. We have repeatedly held that this rule does not allow an expert to render conclusions of law.[8] In any event, we conclude that the Tax Court did not abuse its discretion in not admitting the expert witness reports into evidence.[9]

C. VALIDITY OF REGULATION

1. *Legislative or Interpretive Regulation?*

As a threshold matter, we must determine whether regulation § 1.56(g)-1(d)(3)(iii)(E) is legislative or interpretive. A legislative regulation is one that is "issued under a specific grant of authority to prescribe a method of executing a statutory provision."[10] In contrast, an interpretive regulation is one that is promulgated pursuant to the Treasury's general authority under I.R.C. § 7805 to prescribe regulations.[11] As explained above, courts must accord a higher degree of deference to a legislative regulation than to an interpretive one.

---

[8]*E.g., Alldread v. City of Grenada,* 988 F.2d 1425, 1436-37 (5th Cir.1993); *Owen v. Kerr-McGee Corp.,* 698 F.2d 236, 240 (5th Cir.1983). *See* FED.R.EVID. 704(a) ("testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue *to be decided by the trier of fact.*") (emphasis added).

[9]*See United States v. Milton,* 555 F.2d 1198, 1203 (5th Cir.1977) ("expert opinion may still be excluded ... if the trial court determines that the expert's specialized knowledge will not assist the trier of fact to understand the evidence.").

[10]*Dresser Indus. v. Commissioner,* 911 F.2d 1128, 1137 (5th Cir.1990) (internal quotations and citations omitted).

[11]*Id.*

When Congress adopted OBRA in 1989, it made a number of changes to the AMT. Of significance to our inquiry is OBRA § 7611(g)(3) which provides:

> REGULATIONS ON EARNINGS AND PROFITS RULES.—Not later than March 15, 1991, the Secretary of the Treasury or his delegate shall prescribe initial regulations providing *guidance* as to which items of income are included in adjusted current earnings under section 56(g)(4)(B)(i) of the Internal Revenue Code of 1986 and which items of deduction are disallowed under section 56(g)(4)(C) of such Code.[12]

Based on that provision, the Tax Court determined that the regulation in question is legislative rather than merely interpretive.

Not surprisingly, Taxpayer contends that the Tax Court erred in this conclusion. Specifically, Taxpayer asserts that Congress merely directed the Treasury Department to furnish "guidance" and did not delegate authority to decide which items were or were not deductible in determining E & P and, in turn, ACE. Accordingly, Taxpayer insists that the regulation in question is an interpretive regulation and thus entitled to less deference. We are not persuaded.

Taxpayer cites no authority for its contention that the wording of OBRA § 7611(g)(3) makes the regulation in question an interpretive one, and we have found none on our own. Although Taxpayer would make much over OBRA's use of the word "guidance," that alone is not nearly enough to transform the instant legislative regulation into an interpretive one. To the contrary, we are convinced that a fair reading of OBRA § 7611(g)(3) makes clear that Congress specifically delegated authority to the Treasury to issue the regulation in question.

This reading also comports with our prior holdings.[13] We acknowledge that a regulation issued pursuant to a specific directive may nevertheless be interpretive to the extent that it exceeds Congress's specific grant of authority,[14] but that is not the case here. The regulation in question

---

[12]Omnibus Budget Reconciliation Act of 1989, P.L. No. 101-239, § 7611(g)(3), 103 Stat. 2106, 2373 (emphasis added).

[13]*See, e.g., Anderson, Clayton & Co. v. United States,* 562 F.2d 972, 976 n. 6 (5th Cir.1977) ("regulations issued pursuant to a specific statutory authorization are clearly legislative.").

[14]*See Dresser,* 911 F.2d at 1138 (a court must "examine both the statutory language and the regulation itself to determine if in fact the agency has engaged in rulemaking under a specific or general grant of authority.").

addresses the very subject matter of OBRA § 7611(g)(3)'s directive. We conclude that the regulation at issue is legislative and thus entitled to the greater degree of deference spelled out above.

2. *Regulation Valid Exercise of Authority?*

Before analyzing the validity of Treasury Regulation § 1.56(g)-1(d)(3)(iii)(E), we briefly survey the AMT regime so that the context in which we make such an analysis may be better understood.

### a. *Alternative Minimum Tax*

The AMT was enacted by Congress in an attempt to ensure that taxpayers with significant levels of economic income pay at least a minimum amount of tax on that income.[15] To achieve this goal, some items that are permitted deductions or exclusions from income under the regular income tax regime are not available in computing AMTI. For example, tax-exempt interest on particular private activity bonds—an item that is excluded from regular taxable income—is not excluded from alternative minimum taxable income.[16] Similarly, accelerated depreciation on designated kinds of property, an item that is an allowed deduction for regular income tax purposes, is not permitted for purposes of AMT.[17] The regulation we review today seeks to ascribe that same treatment to dividends paid to ESOPs under § 404(k).

Once AMTI for corporations is computed, a flat rate of 20 percent is applied to calculate the taxpayer's "tentative minimum tax."[18] Finally, a corporate taxpayer owes AMT only to the extent that the corporation's tentative minimum tax *exceeds* its regular tax liability.[19]

### b. *ACE Adjustment*

---

[15]*See* S. REP. NO. 313, 99th Cong., 2d Sess. 518 (1986) (discussing the objectives of the alternative minimum tax).

[16]I.R.C. § 57(a)(5).

[17]*See* I.R.C. § 57(a)(6).

[18]I.R.C. § 55(b).

[19]I.R.C. § 55(a).

One of the adjustments that must be made when computing AMTI for corporations involves ACE.[20] To the extent that ACE exceeds AMTI (as calculated to that point), an adjustment equal to 75 percent of this excess is added to AMTI.[21] For computing ACE, § 56(g)(4)(C)(i) provides that "[a] deduction shall not be allowed for any item if such item would not be deductible for any taxable year for purposes of computing *earnings and profits*."[22] Section 56(g)(5)(A) defines the term "earnings and profits" to mean "earnings and profits computed for purposes of subchapter C."

Regulation § 1.56(g)-1(d)(3)(iii)(E) expressly lists dividends deducted under § 404(k) as not being deductible for purposes of computing E & P. Thus, this regulation had the effect of increasing Taxpayer's 1990 AMTI by $1,080,000,[23] resulting in an AMT liability, when combined with Taxpayer's other income and adjustments, of over $210,000.

### c. *Earnings and Profits*

As is apparent from the language of § 56(g)(4)(C)(i), the ACE adjustment with respect to § 404(k) dividends depends on the treatment of those dividends for the purposes of computing E & P. Historically, E & P is a corporate tax concept which predates the AMT. Although the Internal Revenue Code does not comprehensively define the term "earnings and profits," I.R.C. § 312 and the regulations thereunder provide the manner in which a number of items are treated for purposes of calculating E & P.

The concept of E & P is best understood as a measure of a corporation's ability to make distributions in excess of its shareholders' initial investments.[24] Accordingly, E & P is similar, but not

---

[20]I.R.C. § 56(g).

[21]I.R.C. § 56(g)(1).

[22]I.R.C. § 56(g)(4)(C)(i) (emphasis added).

[23]$1,440,000 § 404(k) dividend $\times$ 75% ACE adjustment.

[24]*See* 10 MERTENS LAW OF FEDERAL INCOME TAXATION § 38C.01, at 3 (1991). For example, earnings and profits is used to determine whether a distribution is treated as dividend income or as a return of capital. *See* I.R.C. §§ 301(c), 316.

identical, to the "economic income of the corporation available for distribution to its shareholders."[25] This is the reason that tax-exempt interest income, which is excluded from regular taxable income, is not excluded in computing E & P: Tax-exempt income increases the ability of a corporation to make a distribution in excess of shareholders' initial investment.[26] Other "artificial" deductions, such as the dividends received deduction, which are allowed for regular income tax purposes but do not impair the ability of the corporation to make such distributions, are not taken into account in computing E & P.[27]

### d. *Treatment of § 404(k) Dividends in Computing E & P*

Although Taxpayer presents a number of arguments for its contention that § 404(k) dividends should be deductible in computing E & P, we focus only on those that we deem meritorious.

The Commissioner and Taxpayer agree on two general principles: (1) "Ordinary" dividends (as distinguished from § 404(k) dividends) are not deductible in computing E & P,[28] and (2) sums paid as compensation to employees are deductible in computing E & P. The reason that "ordinary" dividends are not deductible in computing E & P is that they are distributions *out of* E & P.[29] In other words, "ordinary" dividends may be viewed as distributions *of* economic income, not a component

---

[25]*See* CONFERENCE REPORT ON THE TAX REFORM ACT OF 1984, H.R. REP. NO. 861, 98th Cong., 2d Sess. 184 (1984) ("In general, a corporation's earnings and profits are intended to be a measure of the economic income of the corporation available for distribution to its shareholders.").

[26]*See* Treas.Reg. § 1.312-6(b).

[27]The dividends received deduction (DRD) allows a corporation to deduct all or a portion, depending on its ownership interest in the distributing corporation, of the dividend income that it receives. *See* I.R.C. § 243. The purpose of the DRD is to help prevent the normal corporate income tax scheme of double taxation from becoming one of triple or more taxation when dividend income passes through multiple corporations before reaching the ultimate noncorporate shareholder. The DRD thus may be viewed as an "artificial" deduction as this deduction does not decrease the economic wealth of the corporation. The same cannot be said for § 404(k) dividends.

[28]Of course, "ordinary" dividends do reduce accumulated earnings and profits, but that simply reflects the unsurprising fact that once a corporation has distributed earnings in the form of a dividend, those earnings are no longer available to be distributed in the future.

[29]*See* I.R.C. § 316(a).

used to compute economic income. Compensation, on other the hand, is a true economic expenditure which is a component used to determine economic income.

This distinction between regular dividends and employee compensation is the foundation on which Taxpayer constructs its insistence that the regulation in question is invalid. Taxpayer asserts that, in *substance,* § 404(k) dividends are compensation to employees, albeit they are in the *form* of dividends and are *labeled* dividends. Taxpayer offers a number of reasons in support of this conclusion.

First, it is antithetical to the corporate income tax system to allow a deduction for any dividend paid because the system is premised on income being taxed both at the corporate level and the shareholder level. Acknowledging that an item's regular tax treatment cannot be dispositive for E & P purposes, Taxpayer nevertheless contends that the exceptional treatment of § 404(k) dividends for regular income tax purposes supports the assertion that the *substance* of these payments is compensation.

Second, the legislative history to § 404(k) suggests that these dividends are in the nature of compensation. For example, I.R.C. § 404(k)(5)(A) empowers the Treasury to disallow a deduction under § 404(k) when such a payment would constitute the avoidance of taxation. The legislative history to that provision states "[t]hus, for example, if amounts paid by an employer, and treated for tax purposes as 404(k) dividends, are the payment of *unreasonable compensation,* such payments would not qualify for treatment as section 404(k) dividends."[30] Reference to "unreasonable compensation," argues Taxpayer, would be unnecessary with regard to "ordinary" dividends, so such reference in the context of § 404(k) dividends suggests that these dividends are indeed an alternative form of compensation. In other words, if abusive payments in the form of § 404(k) dividends constitute *unreasonable* compensation, appropriate § 404(k) dividends must constitute *reasonable* compensation. It follows, insists Taxpayer, that any distribution in the nature of compensation cannot by definition be a true dividend. Likewise, an actual disbursement in the nature of compensation must

---

[30]S.REP. NO. 313, 99th Cong., 2d Sess. 1034 (1986).

10

reduce E & P.

Third, Taxpayer asserts that the employee-recipient's tax treatment of a 404(k) dividend favors its position. Specifically, although such amounts are *reported* as dividends, "the payment is to be treated, *for any other purpose,* as a plan distribution and not an investment income."[31]

Fourth, as mentioned by the Tax Court, generally accepted accounting principles (GAAP) customarily treat the payment of dividends to an ESOP as an expense for financial accounting purposes; "ordinary" dividends, of course, are not treated as an expense under GAAP. Inasmuch as accounting income, like E & P, attempts to measure economic income, Taxpayer reasons, GAAP's treatment of dividends paid to ESOPs provides support for allowing a deduction for purposes of calculating E & P.

Finally, Taxpayer argues that (1) the regulation in question undermines the tax-favored status that Congress has bestowed on ESOPs, and (2) the absence of an express statutory adjustment for § 404(k) dividends for AMT purposes counsels against finding one by way of tinkering with E & P and thus ACE.

In the absence of an express legislative regulation to the contrary, Taxpayer's arguments would be compelling and would be likely to carry the day. Once again, though, a highly deferential standard of review, rather than logical analysis, prevails. Treasury Regulation § 1.56(g)-1(d)(3)(iii)(E) is consistent with the fact that these payments are dividends in name and in form. No matter what other criticism we might level at the instant regulation, given our extremely restrictive standard of review and the fact that the Treasury's interpretation for purposes of AMT is congruent with the treatment of other dividends, we cannot go so far as to say that this regulation is arbitrary, capricious, or contrary to the statute. Even if we should harbor substantial doubts about whether Congress intended this result, and were to agree with Taxpayer that it is counter-intuitive in light of Congress's encouragement of the creation of ESOPs through the enactment of a comprehensive scheme of tax incentives—including deductibility of § 404(k) dividends—our review is shackled by

---

[31]Announcement 85-168, 1985-48 I.R.B. 40 (Dec. 2, 1985) (emphasis added).

11

the standard heretofore explained. We are therefore constrained to affirm the Tax Court's conclusion that Treasury Regulation § 1.56(g)-1(d)(3)(iii)(E) is valid. Any favorable change in the treatment of § 404(k) dividends for purposes of computing the ACE adjustment is a matter for Congress and not the courts.[32]

D. RETROACTIVE APPLICATION

As noted above, Taxpayer started planning for the adoption of an ESOP well before OBRA was enacted and actually entered into the ESOP transaction several months prior to the proposed regulation's issuance on May 3, 1990, albeit after the effective date of OBRA. Moreover, that regulation was not made permanent until March 15, 1991. Nevertheless, the Secretary of the Treasury did not act to make the effect of this regulation prospective only, choosing instead to make its retroactivity applicable to all taxable years ending after December 31, 1989, the month in which OBRA had been enacted. Taxpayer argues that this retroactive application was improper.

Section 7805(b) provides that the Secretary of the Treasury "may prescribe the extent, if any, to which any ruling or regulation, relating to the internal revenue laws, shall be applied without retroactive effect." Although we have noted that regulations generally will have retroactive effect, the failure to limit a regulation to prospective application only is nevertheless reviewable for an abuse of discretion.[33] Indeed, as other courts have exhorted in this context, "[t]he Internal Revenue Service does not have carte blanche."[34]

As we stated in *Anderson, Clayton & Co,* the following factors are relevant considerations when reviewing the Secretary's exercise of discretion to adopt retroactive regulations:

> (1) whether or to what extent the taxpayer justifiably relied on settled prior law or policy and whether or to what extent the putatively retroactive regulation alters that law;

---

[32]We cannot help but note in passing that Congress has not acted to change this matter in the five-plus years since the regulation was issued in permanent form.

[33]*Anderson, Clayton & Co. v. United States,* 562 F.2d 972 (5th Cir.1977), *cert. denied,* 436 U.S. 944, 98 S.Ct. 2845, 56 L.Ed.2d 785 (1978).

[34]*International Business Machines Corp. v. United States,* 170 Ct.Cl. 357, 343 F.2d 914, 920 (1965), *cert. denied,* 382 U.S. 1028, 86 S.Ct. 647, 15 L.Ed.2d 540 (1966).

(2) the extent, if any, to which the prior law or policy has been implicitly approved by Congress, as by legislative reenactment of the pertinent Code provisions;

(3) whether retroactivity would advance or frustrate the interest in equality of treatment among similarly situated taxpayers; and

(4) whether according retroactive effect would produce an inordinately harsh result.[35]

This list of relevant considerations is neither exhaustive nor exclusive.[36] Indeed, as the list merely reflects a distillation of prior case law,[37] these factors are intended to serve as flexible guidance, not rigid requirements. Neither is the list conjunctive, as the Commissioner would urge; that is, a court need not conclude that all four considerations augur against retroactivity to require prospective effect only.

Of the four *Anderson, Clayton* factors, courts tend to emphasize the first one most heavily.[38] The Commissioner argues that, as no affirmative authority for deducting § 404(k) dividends in computing E & P existed prior to the issuance of the regulation in question, this factor provides no basis for complaining of the regulation's retroactivity. We find this approach to be convoluted: The more telling observation would be that, given the presumption of deductibility of § 404(k) dividends under the regular corporate income tax regime, no affirmative authority for disallowing such deductions for purposes of AMT existed prior to the issuance of the proposed regulation. Under the particular circumstances of this case, then, we reject the Commissioner's invitation simply to end the inquiry at this point.

True, prior to the issuance of the regulation in question, no authority had addressed the specific question whether § 404(k) dividends were deductible in computing E & P, one way or the

---

[35]*Anderson, Clayton & Co.,* 562 F.2d at 981.

[36]*Id.* at 981 n. 19.

[37]*Id.* at 981.

[38]*See, e.g., Helvering v. R.J. Reynolds Tobacco Co.,* 306 U.S. 110, 59 S.Ct. 423, 83 L.Ed. 536 (1939). Depending on the circumstances of a particular case, of course, other factors may be more important. *See, e.g., International Business Machines Corporations v. United States,* 170 Ct.Cl. 357, 343 F.2d 914 (1965), *cert. denied,* 382 U.S. 1028, 86 S.Ct. 647, 15 L.Ed.2d 540 (1966) (emphasizing the equality of treatment among similarly situated taxpayers).

other. By the same token, of course, no prior authority supported the proposition that § 404(k) dividends were *not* deductible. But this does not mean that settled law relevant to the issue did not previously exist; indeed, it did. Prior to the issuance of the regulation in question, the law was settled that treatment of § 404(k) dividends was different from the treatment of "ordinary" dividends for virtually every purpose of the Internal Revenue Code. Similarly, the legal authorities discussed above, which point to the substance of § 404(k) dividends as being compensation, were settled law. Moreover, the fact that AMT had never before been imposed on § 404(k) dividends was settled law.[39] And, finally, the numerous tax incentives provided by Congress for the creation of ESOPs were settled law.

Our own review of the state of the tax law as it existed prior to the issuance of this regulation convinces us that Taxpayer and its expert advisors were entirely justified in relying on prior law for the conclusion that § 404(k) dividends are deductible in computing E & P; neither was there anything in the literature that would have given a corporate taxpayer any inkling, much less a reasonable basis, for predicting that § 404(k) dividends would be subjected to such a Draconian treatment as the one embodied in the subject regulation.[40] In this respect, the instant case is distinguishable from *Anderson, Clayton & Co.* in that Taxpayer can demonstrate much more than that the law was merely "unsettled."[41] Furthermore, as illustrated by the facts of this particular case, the retroactive application of this regulation has already produced inordinately harsh results. Nevertheless, from the

---

[39]The ACE adjustment applies for taxable years beginning after December 31, 1989. Its predecessor was the book income adjustment, applicable to taxable years beginning in 1987, 1988, and 1989. *See* I.R.C. § 56(f) (repealed 1989). The book income adjustment essentially provided that to the extent that book income exceeded AMTI (as calculated to that point), an amount equal to 50 percent of this excess was added to AMTI. As GAAP customarily treats dividends paid to an ESOP as an expense, these dividends would not have been subjected to AMT in years prior to 1990.

[40]Although of little, if any, weight, we note that the many negative comments received with regard to the proposed regulation comport with our analysis of the prior law and thus with the foreseeability—or lack thereof—of the position the Treasury embodied in the regulation.

[41]*Anderson, Clayton & Co. v. United States,* 562 F.2d 972, 983-84 (5th Cir.1977), *cert. denied,* 436 U.S. 944, 98 S.Ct. 2845, 56 L.Ed.2d 785 (1978).

14

time that OBRA was adopted in December 1989, cautious corporate taxpayers could have and should have expected that significant changes in AMT were coming for corporations and that these changes would likely not be favorable to corporations. That observation, coupled with the general rule that tax regulations are presumably retroactive, at least to the effective date of the statute that they implement, keeps the instant taxpayer from pleading total unforeseeability, at least as a general proposition.

Despite these observations, we are constrained to conclude that the Secretary of the Treasury is not guilty of abuse of discretion in failing to limit the effect of regulation § 1.56(g)-1(d)(3)(iii)(E) to prospective only. The Supreme Court, in *United States v. Carlton,* noted that the test for the validity of retroactive effect of statutes and regulations affecting economic policy embodies a search for arbitrariness or irrationality, which turns on the presence or absence of a rational legislative purpose.[42] The Commissioner proffers two rational purposes for not limiting the subject regulation's effect to prospective only: The effective date of the regulation approximates the date of adoption of OBRA (and pre-dates Snap-Drape's adoption of its ESOP and the attendant bank borrowing); and the regulation is consistent with existing law. Although we have explicated our disagreement with the latter, we concede that the former is sufficient here to meet the rational purpose test. The legislation in question—OBRA—instructed the Secretary to adopt and implement regulations, and the regulation sub judice responds to that Congressional mandate. As such, *Carlton's* arbitrary-or-irrational test is met and we are powerless to abrogate retroactivity of the regulation. Even though, as was stated in *International Business Machines Corporation,* the Secretary of the Treasury does not have carte blanche to allow every regulation to remain retroactively effective, such retroactivity in tax regulations is presumed and the Secretary's decision not to limit the effect of this regulation to prospective effect only commands broad deference. We therefore affirm the Tax Court's holding, in favor of the Commissioner, that regulation § 1.56(g)-1(d)(3)(iii)(E) has application with respect to § 404(k) dividends for taxable years ending after December 31, 1989.

---

[42]512 U.S. 26, ----, 114 S.Ct. 2018, 2022, 129 L.Ed.2d 22 (1994).

III

CONCLUSION

For the foregoing reasons, we hold that Treasury Regulation § 1.56(g)-1(D)(3)(iii)(E) is valid and that failing to make its effect prospective only did not constitute an abuse of discretion by the Secretary of the Treasury. The judgment of the Tax Court is therefore

AFFIRMED.