UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 96-30655
_____


UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

NORBERT A. GRIFFITH,

Defendant-Appellant.

_____

Appeal from the United States District Court for the
Eastern District of Louisiana
_____

July 17, 1997

Before WISDOM, BENAVIDES, and STEWART, Circuit Judges.

BENAVIDES, Circuit Judge:

Norbert A. Griffith appeals his conviction for conspiring to possess marijuana with the intent to distribute. He claims that a federal agent who was not shown to be an expert in the jargon used by drug dealers gave improper opinion testimony interpreting his wiretapped conversations with another suspect. He also contends that the district court failed to adequately instruct the jury on the Fifth Amendment privilege against self-incrimination after the prosecutor improperly commented on his failure to testify. Griffith also appeals his sentence. We affirm.

This case arose out of a Drug Enforcement Administration (DEA) investigation into the marijuana trafficking activities of Kenneth J. McMillan. From February 14 to March 1, 1995, the DEA lawfully wiretapped two of McMillan's telephone lines. The DEA intercepted and recorded five conversations between McMillan and Griffith; three of these conversations were played at trial. Special Agent Susan Nave identified the speakers and interpreted their cryptic dialogue for the jury, explaining that the conversations concerned available quantities, prices, and qualities of marijuana. This testimony was corroborated by Henry Richardson, a DEA intelligence analyst, who testified as an expert witness for the prosecution.

On March 1, 1995, the DEA and local police executed a search warrant at the Griffith family's home at 2852 Pritchard Road, Marrero, Louisiana.[1] In a bedroom closet, along with men's clothing and a rifle, they found a green duffel bag containing 40 clear plastic bags of marijuana weighing approximately 45 pounds.

Griffith's wife, Roseanna, and his son, Scott, arrived home separately soon after the search. An agent asked Scott to page his father electronically; he did so, and the appellant soon arrived at the house in his red Ford pickup truck. He was arrested, and a search of the truck turned up a daily planner containing two

---

[1]The defense presented evidence that Griffith did not reside in the home at the time and argued that no incriminating evidence found there could be connected with him. The jury necessarily rejected this theory.

marijuana cigarettes, a partially smoked marijuana cigarette on the driver's side floorboard, and a small address book containing the names and phone numbers of McMillan and another co-defendant.

Griffith was indicted on a single count of conspiracy to possess marijuana with intent to distribute in violation of 21 U.S.C. § 841(a)(1). 21 U.S.C. § 846. He was convicted on December 12, 1995, after a two-day jury trial, and was sentenced on June 19, 1996, to a prison term of 30 months.

## II.

### A.

Language evolves to reflect the preoccupations of a culture. As the scourge of drug abuse took root in the United States, a vivid slang vocabulary developed to describe various illegal drugs, their consumption, and their effects. Just as the Eskimos reputedly have 22 different words for snow,[2] we now have, by one count, 223 terms for marijuana.[3] The most common of these terms, such as "grass" and "pot," are no doubt familiar to millions of Americans, and may be understood by juries without the aid of expert witnesses.

On the other hand, there is a specialized jargon endemic to

---

[2]Although the accuracy of this claim has been questioned in recent years, "it is still undoubtedly true that . . . cultures with different needs are likely to have correspondingly different vocabularies." Janet E. Ainsworth, *Categories and Culture*, 82 CORNELL L. REV. 19, 42 n.52 (1996).

[3]ESTHER LEWIN & ALBERT E. LEWIN, THE THESAURUS OF SLANG 243 (1994). *See also* JONATHON GREEN, THE SLANG THESAURUS xiii (1986) ("'The chief stimuli of slang are sex, money and intoxicating liquor,' opined Dr. J.Y.P. Greig in 1938. Bowing to current events one must add drugs to that list.").

the illegal drug distribution industry. A primary purpose of this jargon is to conceal from outsiders, through deliberate obscurity, the illegal nature of the activities being discussed. Drug traffickers will often refer to ordinary items of commerce in lieu of illegal narcotics. The Seventh Circuit informs us that drug dealers have referred to their merchandise as "three pairs of boots" and as "pianos" sold by the kilogram. *See United States v. Romero*, 57 F.3d 565, 570 (7th Cir. 1995) (citations omitted). Traffickers also have referred to a supply of heroin as "the boy" or "the boyfriend," and as "briefs" and "motions." *See United States v. Simmons*, 923 F.2d 934, 946 (2d Cir.), *cert. denied*, 500 U.S. 919, 111 S.Ct. 2018, 114 L.Ed.2d 104 (1991).

It is implausible to think that jurors can understand such arcane allusions without expert assistance. Drug traffickers' jargon is a specialized body of knowledge, familiar only to those wise in the ways of the drug trade, and therefore a fit subject for expert testimony. As one court observed, "There is no more reason to expect unassisted jurors to understand drug dealers' cryptic slang than antitrust theory or asbestosis." *United States v. Delpit*, 94 F.3d 1134 (8th Cir. 1996) (citation omitted). In short, "Jurors as well as judges often need help in deciphering the jargon of those engaged in the drug trade." *United States v. Walls*, 70 F.3d 1323, 1326 (D.C. Cir. 1995), *cert. denied*, ---U.S.---, 116 S.Ct. 1445, 134 L.Ed.2d 565 (1996).

Our own court has held more generally that "an experienced narcotics agent may testify about the significance of certain

4

conduct or methods of operation to the drug distribution business, as such testimony is often helpful in assisting the trier of fact understand the evidence." *United States v. Washington*, 44 F.3d 1271, 1283 (5th Cir.), *cert. denied*, ---U.S.---, 115 S.Ct. 2011, 131 L.Ed.2d 1010 (1995). We have allowed law officers to testify to the "argot or seemingly secret jargon" used in drug money laundering. *United States v. Fuller*, 974 F.2d 1474, 1482-83 (5th Cir. 1992), *cert. denied,* 510 U.S. 835, 114 S.Ct. 112, 126 L.Ed.2d 78 (1993). We see no reason the same principle should not apply to drug traffickers as well as their bankers.

### B.

The prosecution, as part of its case in chief, replayed two wiretapped conversations between Griffith and McMillan. In the first conversation, Griffith said that he went somewhere to get "50 days of work" but that "there was only 39." Agent Nave testified that "days of work" was a euphemism for "pounds of marijuana." Later in the conversation, the following exchange took place:

McMillan: How was that man what you got from her?

Griffith: It's . . . pretty decent. It's not super super, but it's, it's, ain't had no complaints. The smell is super. . . . [T]hey like that pine smell.

McMillan: Well, hey man, why don't you, um, pull me a big quarter aside, I'll come get it tomorrow. You got some left?

Griffith: Yeah. Oh ain't no problem. . . . I got about two weeks worth of work left.

McMillan: Okay, I'm sitting over here smoking my very last one.

Nave stated that this dialogue concerned the quality of a

shipment of marijuana, the buyers' satisfaction with it, and a request by McMillan that Griffith restock his supply.

In the second conversation, McMillan said he needed "to pull together another 30." Griffith replied that he did not have that much, but had some and expected more in the next week. McMillan also said that "these are going to go for 8" but that he would give Griffith "a certain amount at that 5 price like I told you." He asked for Griffith's help "with the other on the 8 mark."

Nave testified that "30" meant a $30,000 shipment of marijuana, and that the "5 price" and "8 price" meant $500 and $800 a pound. She stated that McMillan was discussing selling a quantity of marijuana to Griffith for $500 a pound.

C.

Griffith's and McMillan's references to marijuana prices and quantities would have been incomprehensible to the jury without assistance from a witness schooled in the ways of the drug trade. Even if the references to the "pine smell" and "smoking" hinted at the topic being discussed, Agent Nave's opinion testimony undoubtedly was helpful to the jury in deciphering the details of the proposed transactions. Griffith claims, however, that the district court abused its discretion by allowing Nave to interpret his wiretapped conversations. He contends that the government failed to carry its burden of proving, by a preponderance of the evidence, that Nave was an expert in the "jargon," "argot," or "code words" of the wholesale drug trade. *See Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, ---, 113 S.Ct. 2786, 2796

6

n.10, L.Ed.2d (1993) (under FED. R. EVID. 104(a), the proponent of expert testimony must establish the witness's qualifications by a preponderance of proof (internal citation omitted)).

Griffith's argument raises the threshold question of whether Nave was in fact permitted to testify as an expert. As a formal matter, Nave was neither proffered as an expert by the prosecution nor qualified as one by the district court. Nonetheless, the district court questioned her about her experience as a drug investigator and repeatedly offered defense counsel the opportunity to traverse or cross-examine her as to her "expertise."[4] Moreover, Nave herself testified that her opinions were based on her "knowledge and experience." *Cf.* FED. R. EVID. 702.

On balance, we think it is clear that the district court and the parties treated Nave in substance as an expert. The question is whether this was an abuse of discretion, *Snap-Drape, Inc. v. Commissioner of Internal Revenue,* 98 F.3d 194, 197 (5th Cir. 1996), either because Nave was in fact unqualified to give expert testimony, or because the court failed to formally qualify her.

We have little doubt that Nave was qualified to give expert testimony regarding the ways of drug dealers. Her experience at the time of trial included eight-and-one-half years as a DEA agent, during which she participated in 50 investigations, working at times in an undercover capacity. In her career, Nave surely has

---

[4]The district court itself was uncertain whether Nave had testified as an expert. At the conclusion of the two-day trial, the court told the jury: "We had some expert witnesses--one, at least, who testified, perhaps more." Richardson was unmistakably an expert witness; "perhaps" Nave testified as an expert as well.

had ample opportunity to listen to drug dealers converse and to decipher the nuances of their conversations. Moreover, we are not convinced that the government, having established Nave's qualifications as an expert in drug trafficking generally, was required to prove her particular knowledge of drug dealers' jargon. Defense counsel could have questioned Nave's credentials at trial, but chose not to traverse or cross-examine her on this issue.

We hold that there was no abuse of discretion in the district court's implicit finding that Nave was qualified as an expert on drug trafficking. She clearly was qualified by knowledge and experience to interpret drug dealers' jargon; the subject "had esoteric aspects reasonably perceived as beyond the ken of the jury," *Romero*, 57 F.3d at 571 (internal citation omitted), making it fit for an expert's analysis; and her testimony shed light on the crucial issue of Griffith's willing participation in a marijuana distribution conspiracy. Nor did the court abuse its discretion by failing to establish Nave's credentials until midway through her testimony. At worst, the district court committed a technical error by failing to state that Nave was qualified as an expert and by not requiring the government to establish her credentials at the start of her testimony.

Moreover, even assuming that an abuse of discretion occurred, it would provide no ground for reversal. The "erroneous admission of expert testimony is subject to harmless error analysis." *United States v. Krout*, 66 F.3d 1420, 1433 (5th Cir. 1995) *cert. denied*, ---U.S.---, 116 S.Ct. 963, 133 L.Ed.2d 884 (1996); *see* FED. R. CRIM.

8

P. 52(a).[5]  The alleged error in this case was harmless for two reasons.  First, any error was one of form rather than substance.  Nave was clearly qualified; that her credentials were established after she began her substantive testimony, rather than at its outset, did not affect Griffith's substantial rights.  Second, Nave's testimony was corroborated by that of Richardson, the DEA intelligence analyst, an undisputed expert.  Even without Nave's opinion testimony, the only plausible interpretation of the conversations put forward at trial was that Griffith and McMillan were discussing the purchase and sale in bulk of marijuana.

Finding no abuse of discretion and, alternatively, no prejudice to Griffith's substantial rights, we hold that the admission of Nave's opinion testimony in the absence of her formal qualification as an expert was not reversible error.

### III.

Griffith claims that the prosecutor violated his Fifth Amendment privilege against self-incrimination by commenting, during her closing argument, on his failure to take the stand.  The prosecutor, Assistant United States Attorney Mary Jude Darrow, concedes that her comment was an error of constitutional magnitude.  Nevertheless, she contends that the district court corrected the error through its curative instructions to the jury.  Alternatively, Darrow, who argued this appeal, maintains that any deficiency in the district court's instructions was harmless in

---

[5]Rule 52(a) states: "Any error, defect, irregularity or variance which does not affect substantial rights shall be disregarded."

light of the "overwhelming evidence of Griffith's guilt."

## A.

The Fifth Amendment provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself . . . ." U.S. CONST. amend. V. This guarantee would be enfeebled if prosecutors were free to suggest, and juries to infer, that defendants who exercised the "right to remain silent" were probably guilty. Consequently, the Supreme Court has condemned adverse comment on the defendant's failure to testify as "a remnant of the inquisitorial system of justice" and "a penalty imposed by courts for exercising a constitutional privilege." *Griffin v. California*, 380 U.S. 609, 614, 85 S.Ct. 1229, 1232-33, 14 L.Ed.2d 106 (1965) (internal quotation marks, citation, and footnote omitted); *see also Carter v. Kentucky*, 450 U.S. 288, 297-98, 101 S.Ct. 1112, 1118, 67 L.Ed.2d 241 (1981). The rule is thus well established that a prosecutor "may not comment directly or indirectly on a defendant's failure to testify." *United States v. Fierro*, 38 F.3d 761, 771 (5th Cir. 1994) (citation omitted), *cert. denied*, ---U.S.---, 115 S.Ct. 1388, 131 L.Ed.2d 240 (1995); *United States v. Dula*, 989 F.2d 772, 776 (5th Cir.) (citations omitted), *cert. denied*, 510 U.S. 859, 114 S.Ct. 172, 126 L.Ed.2d 131 (1993).

## B.

Darrow violated this rule. By Darrow's own account, Griffith kept up a running commentary at the defense table during her rebuttal argument. The transcript does not reveal what Griffith said or how loudly he spoke. But Darrow, vexed by Griffith's

10

commentary, broke off her argument in mid-sentence, turned to him, and asked, "Would you like to take the stand and testify?"

Almost immediately after Darrow's comment, the district court admonished the jury to disregard it. At a sidebar conference, defense counsel objected to the prosecutor's comment and moved for a mistrial. Counsel did not specifically explain the grounds for his objection, stating only that Darrow's comment was "totally out of line, highly improper." Counsel also stated his opinion that no admonition to the jury could cure the error. The district court denied the mistrial motion, but instructed the jury:

> Ladies and gentlemen, let me remind you in the strongest of terms, once again, as I have done in the past, the defendant is presumed innocent throughout the course of the trial. He is presumed innocent until such time, if ever, the government is able to prove his guilt by evidence beyond a reasonable doubt. That presumption of innocence, as I will tell you once again in a few moments, is enough to result in the acquittal of the defendant in the absence of proof beyond a reasonable doubt. Mr. Griffith has absolutely no obligation whatsoever to produce any evidence of innocence at all. You are to disregard Ms. Darrow's comments to Mr. Griffith, and you are to disregard Mr. Griffith's apparent outburst.

Defense counsel did not object to this instruction. Nor did the defense ever request a specific instruction on the Fifth Amendment privilege against self-incrimination. On appeal, however, Griffith contends that the district court erred by failing to specifically instruct the jury on the privilege.

### C.

Because the defense did not object to the district court's curative instructions at trial, our review is governed by the plain

11

error standard. *See* FED. R. CRIM. P. 52(b).[6] *See also United States v. Olano*, 507 U.S. 725, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993); *United States v. Calverley*, 37 F.3d 160 (5th Cir. 1994) (en banc), *cert. denied*, ---U.S.---, 115 S.Ct. 1266, 131 L.Ed.2d 145 (1995). An appellate court may correct an error under this standard only if the appellant demonstrates that there was error; that the error was "plain;" and that it affected his substantial rights. *Id.* at 162-164.

We conclude without difficulty that the district court erred by failing to instruct the jury on the Fifth Amendment privilege. An error is simply "a deviation from a legal rule in the absence of a valid waiver." *Calverley*, 37 F.3d at 162 (citing *Olano*, 113 S.Ct. at 1777). The prosecutor violated a constitutional rule by commenting on Griffith's failure to testify, and the district court failed in its obligation to correct the error. In the curative instruction quoted above, the district court reminded the jury that Griffith was presumed innocent and that the government had the burden of proving him guilty beyond a reasonable doubt. The court neglected to tell the jury that Griffith had a constitutional right not to testify, and that his exercise of that right could not be held against him. Indeed, the record reflects that the jury was never instructed on the Fifth Amendment right to remain silent. Apart from its admonition to disregard the prosecutor's remark, then, the district court left the constitutional error uncorrected.

---

[6]Rule 52(b) states: "Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court."

In our view, the error was plain, in the sense that the remedy for Darrow's improper comment should have been "clear" and "obvious." *Cf. Calverley*, 37 F.3d at 162. An error is plain if it is "so conspicuous that 'the trial judge and prosecutor were derelict in countenancing [it], even absent the defendant's timely assistance in detecting [it]." *Id.* at 163 (quoting *United States v. Frady*, 456 U.S. 152, 163, 102 S.Ct. 1584, 1592, 71 L.Ed.2d 816 (1982)).

In the instant case, the prosecutor's initial constitutional blunder was immediately clear. As Darrow herself told this court, "I knew immediately it was inappropriate, it was improper, and it should never have come out of my mouth." The district court manifestly recognized this, rebuking Darrow, ordering the jury to disregard her remark, and emphatically--if ineffectually-- instructing the jury on the burden of proof and presumption of innocence. The proper remedy should have been as obvious as the initial constitutional error; a Fifth Amendment violation calls for a Fifth Amendment instruction. Instructions on the burden of proof and presumption of innocence "are no substitute for [an] explicit instruction" on the Fifth Amendment privilege. *Carter*, 450 U.S. at 304, 101 S.Ct. at 1121.[7]

Nevertheless, Griffith has failed to establish that the district court's error affected his "substantial rights." *See*

_____

[7]In *Carter*, the court's duty to instruct the jury on the Fifth Amendment privilege arose when the defense requested such an instruction. In this case, the duty was triggered by Darrow's comment. The distinction is immaterial to our analysis.

13

*Calverley*, 37 F.3d at 164 ("The burden of persuasion lies with the defendant."). Consequently, we have no authority to correct the district court's error. *Id.*

We must consider the prosecutor's remark and the judge's response in context. "To determine the potential prejudicial effect of the statements, we must consider the context in which the prosecutor made them." *United States v. Pierre*, 958 F.2d 1304, 1312 (5th Cir.) (en banc), *cert. denied*, 506 U.S. 898, 113 S.Ct. 280, 121 L.Ed.2d 207 (1992); *Fierro*, 38 F.3d at 771 (citations omitted). In determining whether a defendant has been prejudiced by an adverse comment on his failure to testify, our harmless error analysis in *United States v. Shaw* is instructive:

> We have found harmless error in cases where reference to the [defendant's] silence was neither made nor elicited by the prosecution; where the prosecution did not "focus on" or "highlight" the reference; where the comment did not "strike at the jugular" of the defendant's defense; and where there was no further mention of the silence, and there was "strong evidence" of the defendant's guilt.

*Shaw*, 701 F.2d 367, 383 (5th Cir. 1983) (citations omitted), *cert. denied*, 465 U.S. 1067, 104 S.Ct. 1419, 79 L.Ed.2d 744 (1984).

In this case the comment was obviously made by the prosecutor herself, and at a crucial time when the jury's attention should have been riveted on her argument. The potential for serious harm was present. However, it was an isolated comment, which did not "strike at the jugular" of the defense, and which the jury was immediately instructed to disregard. Moreover, no one has suggested that it was a calculated appeal to the jury; to all appearances, Darrow's was a spontaneous remark intended to call

14

attention to Griffith's disruptive behavior during her argument, and not to imply that he was harboring guilty secrets.

Finally, and we think significantly, the prosecution's evidence against Griffith was strong. His tape-recorded conversations, the discovery of approximately 40 pounds of marijuana in his home, and the seizure of marijuana cigarettes from his truck are all highly incriminating. We are confident that the jury, following the district court's instruction to disregard Darrow's comment, convicted Griffith based on the evidence and not because of his refusal to testify. Accordingly, we find that the district court's error did not affect Griffith's substantial rights, and that Griffith has failed to satisfy the third prong of the *Olano* test.

Moreover, even were we to find that Griffith's substantial rights had been affected, we would nonetheless be unable to grant relief under Rule 52(b). Under the "fourth prong" of the *Olano* test, we may exercise our discretion to notice a forfeited error only when "the error seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings." *Johnson v. United States*, ---U.S.---, ---S.Ct.---, ---L.Ed.2d---, 1997 WL 235102 (May 12, 1997) (internal quotation marks and citations omitted). In the circumstances of this case, and particularly in light of the damning wiretap and physical evidence of Griffith's complicity in the conspiracy, a refusal to notice the error would in no way seriously undermine the "fairness, integrity, or public reputation of judicial proceedings."

15

IV.

Griffith challenges two aspects of his sentence. First, he claims that the district court assigned him a base offense level of 18 based on an erroneous finding that 20.43 kilograms of marijuana was seized from the Pritchard Road house. *See* U.S. SENTENCING GUIDELINES MANUAL § 2D1.1(c)(11) (Drug Quantity Table) (1995). Second, he claims that his offense level was increased by 2 based on an incorrect determination that he possessed a dangerous weapon in connection with the offense.

Factual findings used in sentencing need only be supported by a preponderance of the evidence. *United States v. Mourning*, 914 F.2d 699, 706 (5th Cir. 1990). We review challenges to such findings for clear error. *United States v. Manges*, 110 F.3d 1162, 1178 (5th Cir. 1997).

A.

Griffith claims that the marijuana seized from his house weighed less than 20 kilograms and therefore warranted a base offense level of 16 rather than 18. *See* U.S.S.G. §§ 2D1.1(c)(11), (12). He cites the supposed trial testimony of DEA agent Don Douglas that the duffel bag found in the bedroom closet contained 39 one-pound bags of marijuana. Thirty-nine pounds equals 17.7 kilograms; therefore, Griffith claims, the district court erred in its finding that 20.43 kilograms of marijuana was seized.

Griffith misstates the substance of Douglas' testimony. The agent stated: "[W]e eventually found 45 pounds of marijuana in the closet in a green duffel bag." He testified that there were 40

16

plastic bags of marijuana in total, not 39, and reiterated that their total weight was about 45 pounds. Perhaps more important, a DEA lab report cited by the district court in its judgment of conviction and sentence stated that the marijuana seized from Griffith's home weighed 45.05 pounds--the equivalent of 20.43 kilograms.

We perceive no error, and certainly no clear error, in the district court's finding that 20.43 kilograms of marijuana was seized from Griffith's home.[8]

## B.

The guidelines provide for a 2-level enhancement "[i]f a dangerous weapon (including a firearm) was possessed . . . ." U.S.S.G. § 2D1.1(b)(1). This adjustment "should be applied if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense." *United States v. Broussard*, 80 F.3d 1025, 1041 (5th Cir.) (quoting U.S.S.G. § 2D1.1 cmt. 3), *cert. denied*, ---U.S.---, 117 S.Ct. 264, 136 L.Ed.2d 189 (1996).

Griffith argues on several grounds that the district court clearly erred by imposing a 2-level weapon enhancement. The district court justified the increase on the ground that "the rifle was found next to the drugs and a loaded magazine was found in defendant's residence." Griffith first attacks the finding that a loaded magazine was found in the Pritchard Road house. His theory,

---

[8]At one point in its brief, the government appears to concede that the DEA overstated the weight of the marijuana by failing to subtract the weight of the plastic wrappers (400 grams). Any such error was harmless, since the remainder, 20.03 kilograms, still warrants an offense level of 18.

evidently, is that if no ammunition was found, then it is "clearly improbable that the weapon was connected with the offense."

We reject both the theory and the factual assertion on which it rests. First, assuming *arguendo* that no ammunition was found, it does not necessarily follow that it was "clearly improbable" that Griffith's rifle was connected with his offense. There is no suggestion in the guidelines or commentary that unloaded weapons are exempt from the 2-level enhancement in Section 2D1.1(b)(1).

Moreover, even if we were to accept Griffith's theory, it is unsupported by the record. In an addendum to the Presentence Investigation Report (PSR), the probation officer stated that "according to the DEA agents, a loaded magazine was seized from Griffith's house." The report of a probation officer is generally considered reliable enough "to be considered by the trial court as evidence in making the factual determinations required by the sentencing guidelines." *United States v. West*, 58 F.3d 133, 138 (5th Cir. 1995) (quoting *United States v. Bermea*, 30 F.3d 1539, 1575 (5th Cir. 1994), *cert. denied*, 513 U.S. 1156, 115 S.Ct. 1113, 130 L.Ed.2d 1077 (1995)) (additional citations omitted). Griffith has proffered no evidence to overcome the presumption that the documents prepared by the probation officer for sentencing are accurate and reliable. The district court did not clearly err in finding, by a preponderance of the evidence, that a loaded magazine was seized from Griffith's house.

Griffith next contends that even leaving aside the issue of the loaded magazine, it was "clearly improbable" that his rifle was

18

connected with the offense. He claims that the weapon was a souvenir of his Vietnam War service, and that to the best of his knowledge it was inoperable. However, the DEA tested the weapon and found it in working order. Moreover, the rifle was not found in a trophy case or gun cabinet, but in the same closet as the duffel bag full of marijuana. The nexus between the weapon and the offense is not difficult to discern. "The Government may satisfy its burden of proving a connection between the weapon and the offense by showing that the weapon was found in the same location where drugs . . . [were] stored . . . ." *United States v. Flucas*, 99 F.3d 177, 179 (5th Cir. 1996), *cert. denied*, ---U.S.---, 117 S.Ct. 1097, 137 L.Ed.2d 229 (1997). *Accord United States v. Eastland*, 989 F.2d 760, 770 (5th Cir.), *cert. denied*, 510 U.S. 890, 114 S.Ct. 246, 126 L.Ed.2d 200 (1993). The court below did not clearly err by concluding that the government met this burden.

Finally, appellant urges this court to extend the rationale of *Bailey v. United States*, ---U.S.---, 116 S.Ct. 501, 133 L.Ed.2d 472 (1996), to the present context. We decline to do so. Not only is Griffith's argument unpersuasive; it also is foreclosed by our case law. *See United States v. Castillo*, 77 F.3d 1480 (5th Cir.), *cert. denied*, ---U.S.---, 117 S.Ct. 180, 136 L.Ed.2d 120 (1996).

*Bailey* involved a federal statute imposing a five-year minimum sentence on any person who "uses or carries a firearm" in relation to a violent crime or a drug trafficking offense. 18 U.S.C. § 924(c)(1). The Supreme Court held that the statute required, for conviction, "an *active employment* of the firearm by the defendant,

19

a use that makes the firearm an operative factor in relation to the predicate offense." *Id.* at ---, 116 S.Ct. at 505 (emphasis in original). Griffith contends that the same standard should apply in the context of U.S.S.G. § 2D1.1(b)(1). The guideline, however, applies when the defendant "possesses" a dangerous weapon. "Possession" does not presuppose that the defendant used or carried the weapon, so *Bailey*'s "active employment" standard is inapposite.

Moreover, as this court explained in *Castillo*, "the Supreme Court took great pains in *Bailey* to limit its holding to the term "use" as that term is employed in U.S.C. § 924(c)(1), the statute at issue in *Bailey*." *Castillo*, 77 F.3d at 1499 n.34. There is no reason to suppose the Supreme Court would extend Bailey's reasoning to the circumstances before us today.

The district court did not clearly err in its determination that Griffith "possessed" a weapon in connection with his offense, even if Griffith did not brandish or fire the weapon.

V.

Appellant's conviction and sentence are AFFIRMED.