

# In the Court of Criminal Appeals of Texas

No. PD-0905-21

MARKERRION D'SHON ALLISON,

*Appellant*

v.

THE STATE OF TEXAS

On State's Petition for Discretionary Review
From the Sixth Court of Appeals
Gregg County

YEARY, J., filed a concurring opinion.

Does a police officer become an "expert" in the meaning of a slang phrase when he asks a couple of people he knows what that slang phrase means, forms a conclusion about the meaning of that phrase from those

conversations, and then testifies to his opinion at trial? I do not think so.

The Court and I disagree about that matter. But I ultimately agree with the Court that the admission of that kind of testimony was harmless beyond a reasonable doubt in the context of *this* case. And for that reason, I cannot understand why the Court expends so many pages opining that the testimony was properly admitted. I write separately only to explain why I disagree with the Court's decision to affirm the trial court's admission of the officer's alleged "expert" testimony.

## I. BACKGROUND

Jose Jimenez lived with William Benicaso at a house on Clearwood Drive in Longview. Benicaso was known to sell marijuana. On September 8, 2016, Jimenez was at their home alone playing video games and smoking marijuana when four individuals knocked on his door and forced their way in. Jimenez saw that one of the men had a shotgun, and one of them struck him in the back of the head with a pistol and asked him where "it" was. Jimenez testified that he thought they were asking about money or drugs, but he did not know for sure.

Before the men left, they ordered Jimenez to his knees in the living room of the home, told him that he was going to die, and one of the men shot him in the head. Jimenez did not die. He woke up some time later in a pool of his own blood. Jimenez had suffered a fractured skull, and some fragments of his skull were permanently lodged in his brain. He suffered some permanent vision loss and he also lost some of the "gray matter" from his brain.

R.J., T.K, and Owens-Toombs were arrested for the crime, and an arrest warrant was issued for Appellant, but he was not immediately taken into custody. While T.K. was in jail, he spoke with Appellant on a recorded telephone line. On the recording, T.K. can be heard telling Appellant "I need you to pull a Carlos." On another occasion during the same phone call, T.K. told Appellant: "Probably need you to do that Carlos for me, put that money on the books." Then, just before the end of the call, T.K. again said, "Go and pull that Carlos, though," and Appellant responded, "Uh huh." In fact, on five separate occasions during the phone call, T.K. asked Appellant to "pull a Carolos."

The next day (after the phone call between Appellant and T.K.), on January 8, 2017, witnesses saw four people show up at Jimenez's and Benicaso's house. Two of them were wearing ski masks, one hid behind a car in the driveway, and one made his way into the carport. The man in the carport was identified as a black male with dreadlocks or braids. That man fired a gun at the house. The bullet went through a bedroom window, but no one was injured. Prosecutors attempted to use this evidence to prove Appellant tried to silence witnesses to the offense.

After Appellant was arrested, Detective Juarezortega asked Appellant what the phrase "pull a Carlos" meant. Appellant denied knowing what it meant. But he did refer to the phrase as "slang."

To explain the meaning of "pull a Carlos" at trial, the State sought to admit "expert" testimony from Detective Jayson Reed about the meaning of the phrase. Reed's testimony was offered to help establish that Appellant participated in the shooting that took place at Jimenez's and Benicaso's house the day after Appellant and T.K.'s recorded

telephone call. Outside the presence of the jury, Reed testified that he had never been certified or qualified in any area specifically related to slang terminology.

Reed explained that he was initially unaware of the meaning of "pull a Carlos." About three weeks before Appellant's trial, however, Reed's wife—(*who was the prosecutor on this case*)—asked him to talk to one of his sources to find out what the phrase meant. Reed then consulted three sources: a confidential informant, a Lubbock Police Officer named Chris Bethard, and a district attorney's office investigator named Hal Reavis. Reed claimed that his confidential informant told him that "pull a Carlos" meant to "basically do[ ] a shooting" or "take care of a witness." Bethard and Reavis, he claimed, confirmed his confidential informant's understanding.

After the hearing held outside the presence of the jury, the trial court found that Reed was an expert who was qualified to testify about the meaning of slang phrases such as "pull a Carlos." Appellant objected to Reed's testimony on four bases: (1) that Reed was not a qualified expert; (2) that Appellant had not been permitted to cross examine the people Reed relied upon to draw a conclusion about the meaning of the phrase; (3) that Reed's testimony was hearsay; and (4) that it violated the Confrontation Clause. The trial court then overruled Appellant's objections, and Reed testified that, in his expert opinion, "pull a Carlos" means "[t]o conduct a shooting of some sort."

Appellant was convicted of aggravated robbery, but the court of appeals reversed and remanded for a new trial after concluding that the admission of Detective Reed's testimony about the meaning of the term

"pull a Carlos" violated the Confrontation Clause. *Allison v. State*, No. 06-20-00020-CR, 2021 WL 5345133, at \*12, \*14 (Tex. App.—Texarkana Nov. 17, 2021) (mem. op., not designated for publication). This Court then granted the State's petition for discretionary review to consider whether the Confrontation Clause is violated when a witness learns the meaning of a phrase from other people and then testifies to that meaning at trial as if from his personal knowledge.[1]

## II. CONFRONTATION

Texas Rule of Evidence 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue.

TEX. R. EVID. 702. There is no question that this Rule provides for the admission at trial of expert testimony, even when such testimony may

---

[1] The specific grounds for review granted by the Court are the following:

1. "Once a witness learns the meaning of a phrase from other people[,] is the meaning of that phrase thereafter part of the personal knowledge of the witness which the witness can then testify to without violating the Confrontation Clause?"

2. "Are non-hard science expert witnesses required under the Confrontation Clause to perform the same level of independent testing/analysis required of hard science expert witnesses before they can give an expert opinion based on hearsay evidence?"

3. "Did the Court of Appeals err by finding harm from the admission of Detective Reed's testimony?"

not be based on any "scientific" field of inquiry. But must the expert offering the testimony at least be required first to show that he is "qualified" by "knowledge, skill, experience, training, or education" in some "technical" or "other [field] of specialized knowledge" that will "help the trier of fact" to "understand the evidence" or "determine a fact in issue"? Even though the Court's opinion decides that Detective Reed was qualified as a "slang expert," the way that it goes about drawing that conclusion suggests that the answer to my question is no.

In *Morris v. State*, this Court addressed the admissibility of expert testimony that was not based on "science." 361 S.W.3d 649 (Tex. Crim. App. 2011). The Court explained that, in *Nenno v. State*, 970 S.W.2d 549 (Tex. Crim. App. 1998), it had "set forth a framework for evaluating the reliability of expert testimony in fields of study outside the hard sciences." *Morris*, 361 S.W.3d at 654. This framework, the Court explained, "consisted of three questions: (1) whether the field of expertise is a legitimate one, (2) whether the subject matter of the expert's testimony is within the scope of that field, and (3) whether the expert's testimony properly relies upon and/or utilizes the principles involved in the field." *Id*. According to the Court, these questions were "simply a translation of the *Kelly* test appropriately tailored to areas outside of hard science." *Id*. (citing *Nenno*, which in turn cites *Kelly v. State*, 824 S.W.2d 568 (Tex. Crim. App. 1992)). And the Court explained that it "explicitly refrained from developing rigid distinctions between 'hard' science, 'soft' sciences, and nonscientific testimony because we recognized that the distinction between various types of testimony may often be blurred." *Id*. at 654−55.

The testimony at issue in *Morris* pertained to a practice known as "grooming." *Id*. at 656. Special Texas Ranger David Hullum testified in that case that he "had been a Texas Ranger in Eastland for approximately nine years," that he "had played a major role in the investigation of several hundred sexual offenses, approximately seventy-five of which involved child victims[,]" and that "he had been recognized as an expert in the trial court and other courts in connection with sexual offenses against children." *Id*. at 651. He explained that he had experience "with determining the existence of grooming techniques," and "specialized experience and training in the techniques or ploys used by child molesters against children." *Id*. "[G]rooming," according to Hullum, is "an attempt by the offender to get the victim compliant with what he wants to happen." *Id*. He explained that "grooming typically occurs over an extended time period and involves spending intimate time alone with the child." *Id*. He "further explained that grooming involves an element of trust, created by an emotional tie between the offender and the victim[,]" and "cited specific examples of grooming such as supplying the child with alcohol or pornography, engaging in sexual banter, giving or withholding gifts, or telling the child about the adult's own prior sexual experiences." *Id* at 651−52. And he responded that "a perfect example" of grooming would be "a gradual increase in the amount of time an adult stayed each night in a child's bedroom, until the adult spent the entire night there[.]" *Id*. at 652.

All of Ranger Hullum's testimony was grounded in his own personal knowledge based on his own training and experiences as a law enforcement officer. But Ranger Hullum's testimony was nothing like

what happened in this case. Detective Reed's testimony nakedly relied on information he gained from other people who could have been, instead, called to testify in his place. And yet, the Court upholds the admission of his opinion as "expert" testimony.

For its part, the Court identifies the legitimate field of expertise at issue in this case as "slang interpretation." Majority Opinion at 14. But it points to no evidence that Reed has such expertise. It observes that Detective Reed had "specialized knowledge of law enforcement." *Id*. It further explains that Reed was "qualified to testify" on the basis of "his experience and training," which included: (1) his "twenty-eight years" as an employee "with the Longview Police Department"; (2) the fact that he "dealt mostly with narcotics and gang-related crimes, while also executing warrants and gathering intelligence"; (3) the fact that he "dealt with many informants and was familiar with both victims and suspects involved in the narcotics trade"; (4) the fact that he was "familiar with the connection between drugs and other crimes"; and (5) the fact that he "had significant knowledge of other slang terms." *Id*. at 15.

Still, the testimony Reed gave did not pertain to any matter that he already knew about before Appellant was charged. It was about the meaning of a specific phrase—one that, by his own admission, the prosecutor in this case asked him to go out and learn so that he could testify to it at Appellant's trial. The Court admits that defense counsel objected that Reed "had no formal training in slang." *Id*. But the Court says it is "not persuaded that Reed's extensive experience working in

large-scale drug and gang organizations left him unqualified as a slang expert." *Id.*

Nothing about Reed's testimony suggests: (1) that "slang interpretation" is a legitimate field of expertise (although it might be one); (2) that his testimony is within the scope of that field; or (3) that his testimony properly relies upon and/or utilizes any principles involved in the field. *See Morris*, 361 S.W.3d at 654. The Court simply observes that Reed has expertise in *the way* people use slang terms in the drug trade, and personal knowledge of the meaning of certain very commonly used phrases (but not the one at issue in this case), and from that draws the conclusion that Reed appropriately relied upon *that* expertise when he informed the jury of his opinion about *the meaning* of "pull a Carlos." *See* Majority Opinion at 16 ("It is unclear how one is to obtain personal knowledge of the terminology without asking trusted sources within the trade[,]" and "[w]e therefore find Detective Reed's 'soft' science testimony permissible."). But that is not what happened here.

Even if Reed could legitimately testify that slang terminology is developed and used by people involved in criminal activity to hide the content of their communications from people whom those people do not want to know about their activities, and even if he could properly testify about the meaning of certain commonly used phrases other than the one at issue in this case, that is not the disputed testimony *in this case*. In this case, Reed purported to render an opinion about *the meaning of a particular slang phrase* used by specific people that he did not know the meaning of before Appellant was charged. At the same time, he

identified no "principles" by which the meaning of such unknown slang terms used by people involved in crime can be interpreted. Nor did he explain what principles he relied upon in this case to decipher the meaning of the slang phrase he purported to interpret—other than to ask a confidential informant. Instead, he relied on the fact that he is an experienced police officer and offered an opinion based on what he learned from conversations he had with other people outside of court.

I do not believe the Court's opinion sets a precedent that the Court will want to follow in different circumstances. Imagine, for instance, a case in which the State seeks to produce evidence that a defendant was at the location of a crime scene at the time that a crime happened. The prosecutor in that case encourages a police officer to ask around about where the defendant was on the date and time of the offense. The prosecutor then calls the officer as an expert, at trial, in determining the location of individuals at particular moments in time, due to his extensive experience in law enforcement investigations. Then, after the officer testifies that he asked a confidential informant and some other law enforcement officers what they thought, the officer testifies at trial to his "expert" opinion that the defendant was at the scene of the crime. I do not think the Court would approve of admitting *that* officer's opinion as expert testimony. But that is essentially the same thing the Court does today.[2]

---

[2] For that matter, the Court could also, relying on today's precedent, approve of expert testimony from an officer that a particular person was the trigger man in a shooting based on information the officer gained from a confidential informant. The Court could justify that decision by concluding that the officer is an expert in criminal investigations, and that such experts

This Court has said that the trial court's role as "gatekeeper" in the area of scientific evidence requires it to "ensure that evidence that is unreliable because it lacks a basis in sound scientific methodology is not admitted." *Coble v. State*, 330 S.W.3d 253, 273 (Tex. Crim. App. 2010). The trial court's "gatekeeper" role also applies, the Court has suggested, in cases involving the presentation of non-scientific expert evidence. *See Morris*, 361 S.W.3d at 654–55 ("we [have] also explicitly refrained from developing rigid distinctions between 'hard' science, 'soft' sciences, and nonscientific testimony"). So, the trial court's "gatekeeping" function should remain the same whether the court is examining scientific or nonscientific expert opinion testimony.

But the trial court did not fulfill its "gatekeeping" function here. Reed may have had law enforcement experience, but he demonstrated no specialized knowledge of, or special ability to decipher, the meaning of the phrase "pull a Carlos" as used by T.K. in his recorded conversation with Appellant. Reed simply asked a "confidential informant" what that person thought it meant, confirmed that person's conclusion with a few more people employed in law enforcement, and then told the jury what he concluded the slang phrase meant based on those conversations. As the court of appeals noted, only the "confidential informant" would have been able to say "why, when, how, and on what basis he had reached the conclusion that 'pull a Carlos' meant to shoot someone." *Allison*, 2021 WL 5345133, at *11. Admitting Reed's testimony as that of an "expert" permitted the State to deprive Appellant of the opportunity to confront

---

regularly rely on information from confidential informants to determine who is responsible for a crime.

and cross-examine the witnesses Reed relied upon to develop his opinion.

In my view, the Court does not properly hold the trial court responsible for failing to fulfil its expert testimony "gatekeeping" function. Instead, by relying upon the mirage of expert opinion testimony, the Court approves the trial court's admission of testimony in violation of Appellant's Sixth Amendment right to confront the witnesses against him. *See* U.S. CONST. AMEND. VI ("In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him"). Nor would it help to shift the focus and argue that this testimony might have been admissible as lay opinion testimony. Our Rules of Evidence permit an expert to rely upon hearsay "if [it is] of a type reasonably relied upon by experts in that field of expertise." TEX. R. EVID. 703; *Ramirez v. State*, 815 S.W.2d 636, 651 (Tex. Crim. App. 1991). But no such exception is apparent in the Rules for opinions offered by lay witnesses. *See* TEX. R. EVID. 701.

I do not mean to suggest that no one could ever be properly qualified at trial as an expert in deciphering the meaning of slang phrases.[3] An expert properly qualified could even presumably render a reliable opinion on the meaning of a particular slang phrase. The expert doing so would be expected to develop his opinion with reference to his own experience in the field and/or by identifiable principles relied upon

---

[3] There are, after all, people who have been able to decipher the meaning of hieroglyphics created thousands of years ago. And that great feat was not accomplished without a great deal of experience, insight, and effort. *See* Andrew Robinson, *Cracking the Egyptian Code: The Revolutionary Life of Jean-Francois Champollion* (Oxford University Press 2012).

by other experts in that field, and of course applied appropriately in the case at issue. I just do not believe the State properly demonstrated that Detective Reed's testimony about the meaning of "pull a Carlos" constitutes reliable expert testimony in this case.

The Court points to other cases in which courts have allowed similar testimony, such as *United States v. Griffith*, 118 F.3d 318 (5th Cir. 1997). *See* Majority Opinion at 14. But in *Griffith*, as in the other cases pointed to by the Court, the law enforcement personnel who testified to the meaning of slang terms seemed to have discerned the meaning of those obscure words and phrases from their own experiences working to frustrate the criminal activities of persons involved in the illegal drug trade. Never were those law enforcement personnel specifically asked to go out and learn the meaning of a word or phrase, exclusively to develop an opinion about its meaning, so that the opinion could be used against a particular defendant at his trial. Detective Reed did not learn the meaning of the phrase "pull a Carlos" over the course of his many years as a law enforcement officer. He developed his opinion about the meaning of that phrase after being asked by the prosecutor *in this case* to learn the meaning of the phrase *so that it could be presented* against Appellant at his trial.

It is true that the "Advisory Committee Notes" to the Federal Rules of Evidence pertaining to Federal Rule of Evidence 702 explain the following:

> [W]hen a law enforcement agent testifies regarding the use of code words in a drug transaction, the principle used by the agent is that participants in such transactions regularly use code words to conceal the nature of their activities. *The method used by the agent is the application*

> *of extensive experience to analyze the meaning of the conversations.* So long as the principles and methods are reliable and applied reliably to the facts of the case, this type of testimony should be admitted.

Advisory Committee Notes, Federal Rule of Evidence 702, https://www.law.cornell.edu/rules/fre/rule_702 (last referenced on April 11, 2023) (emphasis added). Thus, the Advisory Committee Notes seem to approve of an officer relying on his extensive experience to explain the meaning of a word or phrase he has come to understand. But they *do not* seem to approve of, or even to contemplate, the admission of testimony by a law enforcement officer who, on an isolated occasion, is specifically asked to go out to discover the *particular* definition of a word or phrase *in order to use* that definition against a *particular* defendant in a *particular* trial. That officer's testimony is not based on his extensive experience. It is based on hearsay from *other* persons who happen to know the meaning of a *particular* slang term. Failure to honor a defendant's insistence that those *other* persons be produced to testify constitutes a violation of his right to confront the actual source of that information at his trial. Plainly speaking, the way I see it, I agree with the court of appeals that the trial court erred by admitting Detective Reed's opinion testimony.

### III.  HARM

This Court also granted discretionary review to consider whether the admission of Reed's testimony was harmful. Our rules provide that, because the error was constitutional, the trial court's judgment "must" be "reversed" unless it can be determined "beyond a reasonable doubt that the error did not contribute to the conviction or punishment." *See*

T<small>EX</small>. R. A<small>PP</small>. P. 44.2(a). So, unless we are convinced beyond a reasonable doubt that the error did not contribute to the conviction or punishment, we must reverse.

After considering Reed's testimony in the context of all of the evidence admitted at Appellant's trial, I agree with the Court that it did not affect either his conviction or punishment. In my view, the jury could have, all on its own, understood the basic import of the phrase "pull a Carlos" from the context in which that phrase was used in the recorded conversation itself—even without Reed's explanation of its meaning. And I am also persuaded by the dissenting Justice in the court of appeals who explained that Reed's testimony on the meaning of "pull a Carlos" was "unimportant for the State to advance its overall theory—that Allison participated in the aggravated robbery on September 8[,]" and that "the State had no real need for Reed's testimony" in its effort to prove Appellant guilty of participating in that offense. *Allison*, 2021 WL 53451332, at *18 (Stevens, J., dissenting). Reed's "expert" testimony simply does not appear to be the kind of evidence that would move the needle one way or the other on either guilt or punishment. And so, like the Court, I conclude beyond a reasonable doubt that it was harmless. T<small>EX</small>. R. A<small>PP</small>. P. 44.2(a).

### IV. C<small>ONCLUSION</small>

The court of appeals was correct, in my view, to find that the trial court erred by admitting Detective Reed's opinion testimony about the meaning of the phrase "pull a Carlos." Doing so violated Appellant's right to confront and cross-examine his accuser. But the court of appeals

was wrong to find Reed's testimony harmful. I agree with this Court that the testimony at issue here was harmless.

Because I disagree with this Court's opinion to the degree that it holds that Detective Reed's opinion testimony was properly admitted, I respectfully concur only with its judgment.

**FILED:**                                     April 19, 2023
**PUBLISH**