

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

## NO. PD-0905-21

### MARKERRION D'SHON ALLISON, Appellant

### v.

### THE STATE OF TEXAS

### ON STATE'S PETITION FOR DISCRETIONARY REVIEW
### FROM THE SIXTH COURT OF APPEALS
### GREGG COUNTY

McCLURE, J., delivered the opinion of the court in which HERVEY, RICHARDSON, NEWELL, and SLAUGHTER, JJ., joined. YEARY, J. filed a concurring opinion. KELLER, P.J., and KEEL, J., concurred. WALKER, J., dissented.

## OPINION

We granted the State's petition for discretionary review to decide if the Confrontation Clause was violated when an expert testified to the meaning of a slang phrase he learned from other people. We hold the admission of the expert opinion did not

violate evidentiary rules or Appellant's constitutional right to confront adverse witnesses. Therefore, we reverse the judgment of the court of appeals.

## BACKGROUND

The charged offense

On September 8, 2016, complainant Jose Jimenez was alone at a house on Clearwood Drive in Longview playing video games and smoking marihuana when someone knocked on the door and asked for William Benicaso. Benicaso lived at the house with Jimenez and sold marihuana. Jimenez presumed the person was there to buy marihuana, so Jimenez told the person that nobody else was in the house and that there was no marihuana in the house either.

Later that night, Jimenez was still alone at the house when he heard another knock on the door. Jimenez testified, "I had a really funny feeling as if something bad was going to happen." When he opened the door, he saw the end of a shotgun barrel. Jimenez tried to close the door, but four individuals forced their way inside.

One of the individuals hit Jimenez on the back of the head with a pistol, asking where "it" was. Jimenez told them that "there wasn't anything." He testified that he did not know exactly what they wanted, but "figured it was money or drugs." The four individuals proceeded to "ransack" the house, at one point forcing Jimenez to flip over a bed in one of the bedrooms.

The suspects then sent Jimenez back to the living room and ordered Jimenez to his knees. Jimenez testified, "[T]hey started saying . . . go get T.K. . . . I want to kill this fool."

The individuals then told Jimenez, "[Y]ou're going to die today. You're going to die today for no reason." The last thing Jimenez recalled was the laser site of a handgun trained on the back of his head.[1]

One of the men shot Jimenez in the head. Jimenez survived, but suffered a fractured skull causing him to experience a "brain shift" of two or three centimeters to the left. Jimenez has skull fragments permanently lodged in his brain, permanent vision loss, and lost "some gray matter," which was found at the crime scene.

Jimenez described the assailants to investigators. He described one of the intruders as wearing a mask, black, dark-skinned, "lanky," around 5'8," wearing dark clothing, and no more than twenty-two years old. Although this description was consistent with Appellant's appearance, Jimenez was unable to identify Appellant in a photospread lineup. Jimenez did identify two of the other individuals involved in the robbery from a photographic lineup, however: Sean Owens-Toombs and Trekeymian Allison (referred to as T.K.).

January 6: Subsequent arrest of 3 of the 4 suspects

On January 6, 2017, three individuals were arrested for the September 8 robbery: R.J. (a minor), Owens-Toombs, and T.K. An arrest warrant was also issued for Appellant, but he was not initially apprehended.

---

[1] Jimenez testified, "I remember—I don't know who it was, but someone had pointed a laser site that was on a gun, you could kind of tell. Kind of left it towards my vision to where I could see it and slowly drug it over. I could feel where it was touching the back of my head. Even [though] they don't emit heat, I could almost feel where it was, and after that, I just kind of woke up on the carpet. The front door was open. I was in a pool of my own blood."

January 7: Jail call between Appellant and T.K.

On January 7, 2017, Appellant and T.K. spoke on a recorded telephone line while T.K. was in jail. Appellant said the police were looking for him, and that people were talking about the shooting. T.K. opened the call by asking Appellant, "Hey. . . What's on the street?" Appellant responded, "Everybody thinking, 'Oh, shot a n****r in the head or (inaudible).'" Appellant then referred to his mother telling him, "[Inaudible] said they came to her house looking for me early this morning." T.K. asked, "For what?" Appellant responded, "You know. For that s**t."

After a brief exchange, T.K. said, "I need you to pull a Carlos," to which Appellant asked, "Yeah?" T.K. answered in the affirmative. T.K. told Appellant "We all's in there together" to which Appellant agreed. T.K. then asked, "Why [did R.J.] turn himself in?" T.K. told Appellant, "I'm trying to figure out where they got our name from, for real." Appellant answered, "I dunno. This is bulls**t."

After another exchange in which Appellant and T.K. tried to figure out how their names came up in the investigation, T.K. said, "Probably need you to do that Carlos for me, put that money on the books." T.K. continued, "These n****rs done got our, done got our names in some bulls**t." Appellant questioned what T.K. had just said, when T.K. told Appellant, "That why n****rs you d- get that out the way."

Right before ending the telephone call, T.K. reiterated, "Go on and pull that Carlos, though," to which Appellant responded, "Uh huh." T.K. then ended the call by telling

Appellant "All right. Bye. Be careful, boy." Appellant answered, "That's a bet." Five times during the call, T.K. told Appellant that he needed him to "pull a Carlos."

January 8: Second Clearwood house shooting

The day after the phone call, on January 8, 2017, four individuals surrounded the Clearwood Drive house. Witnesses at the house saw two men wearing ski masks at the front door, another man hiding behind a car in the driveway, and a fourth man inside the carport, who was identified as a black man with long dreadlocks or braids. The man with dreadlocks fired a gun at the house. No one was injured in the shooting, although a bullet went through a bedroom window. No one was ever charged for the January 8 shooting, but prosecutors sought to use it to show Appellant attempted to silence witnesses to the charged offense.

Co-defendant's trial testimony

One of the co-defendants, R.J., testified that he participated in the robbery on the evening of September 8, along with Appellant, Owens-Toombs, and T.K. R.J. said that he had been to the Clearwood house on a prior occasion to buy marihuana from Benicaso, who, according to R.J., sold "pretty good weed" at "a good price."

On the afternoon of September 8, R.J. walked to T.K.'s house to "chill" with Owens-Toombs, T.K., and Appellant, along with some other people he did not know. T.K.'s house was located only a few blocks away from the Clearwood house. Sometime around six o'clock, R.J. decided to go to the Clearwood house to buy some marihuana from Benicaso, but when he arrived, he learned from Jimenez that Benicaso was not home. R.J. asked

Jimenez to tell Benicaso that R.J. had come by the house, and then he left the Clearwood house and returned to T.K.'s house.

When he arrived back at the house, Owens-Toombs, T.K., and Appellant were still there. R.J. said that, after he informed the group that Benicaso was not home, they decided to go back to the Clearwood house to search it for marihuana. The group gathered their guns and drove back to the Clearwood house sometime after dark. R.J. testified that T.K. was carrying a shotgun, Owens-Toombs was carrying a handgun with a laser on it, and Appellant had a small handgun.

When they arrived at the Clearwood house, everyone except R.J. got out of the car. R.J. testified that Appellant was wearing a mask. R.J. stated, "[T]hat's how I knew it was him." R.J. said that none of the others were wearing a mask. When R.J. entered the house, the first thing he saw was Appellant searching the living room. R.J. also saw blood on the floor in the middle of the living room. R.J. said he went to look in the bathroom, which was also in the front of the house, and began searching for the marihuana. According to R.J., he could hear people yelling "back and forth" in one of the back rooms. While the arguing continued, R.J. went into the living room and continued his search. R.J. said that, by that time, Appellant had gone "deeper in the house."

R.J. testified that he never saw Jimenez during the time he was inside the house, which was, in his opinion, about five to seven minutes. According to R.J., he and Appellant

exited the house before Owens-Toombs shot Jimenez. Owens-Toombs and T.K were called as witnesses by the State, but both refused to testify.[2]

Detective Juarezortega's trial testimony

The State called Detective Armando Juarezortega of the Longview Police Department who authenticated a video containing a custodial interview of Appellant. In the interview, Appellant claimed that he did not know if he had been near the robbery location on the night of the robbery. The video also contained an exchange between Juarezortega and Appellant regarding the phrase "pull a Carlos." Multiple detectives asked Appellant if he knew what the term "pull up a Carlo [sic]" meant, but each time Appellant denied knowing what it meant and told Juarezortega that he would rather save that discussion for another day. However, Appellant seemingly corrected the detectives by saying "to pull a *Carlos*," as opposed to "*Carlo*." As the interview continued, Appellant admitted that he had talked to T.K. on the phone while T.K. was in jail. Juarezortega told Appellant that he would hear a recording of his conversation with T.K. during Appellant's trial, which included T.K. asking him to "pull a Carlos," and Appellant agreeing to do so. Appellant repeatedly said that the words meant nothing; yet he followed this comment by referring to the term as "slang."

---

[2] The trial court ruled that neither witness had a Fifth Amendment privilege and ordered both to testify under threat of contempt. Both Owens-Toombs and T.K. refused to answer the prosecutor's questions. Nevertheless, it does not appear from the record that either was held in contempt of court.

Juarezortega then questioned Appellant about the January 8 shooting at the Clearwood house. Appellant responded by telling Juarezortega that he wanted to see a video of the shooting.

Detective Reed's trial testimony

Following Juarezortega's testimony, the State called Detective Jayson Reed who testified as to his investigation of the term "pull a Carlos," given the prevalence of that term's use during the jail call. The State offered the testimony in the attempt to prove that Appellant participated at the second Clearwood house shooting and that it was done to silence the witnesses to the charged offense.

In a hearing outside the presence of the jury, Detective Reed established that he had been in law enforcement for twenty-eight years and that most of that time, his career focused on counter-drug operations. During his counter-narcotic work, he dealt with informants, sources, and cooperating witnesses.[3] Reed also undertook specialized training on criminal gangs. He therefore became familiar with the use of slang terms. Reed explained that there had been occasions when he was unfamiliar with a particular slang term. When that happened, he would ask informants or his sources what the term or word meant. Reed described a number of slang terms used in the narcotics world and how slang terms are constantly changing and can vary by community.

---

[3] Reed explained that "sources" referred to a person who does not receive anything in exchange for the information he gives while a "cooperating witness" or "informant" receives something in exchange for the information.

Reed then testified to being asked by the prosecutor to research the meaning of the phrase "pull a Carlos" and explained how he contacted one of his confidential informants to ask what the term meant. Detective Reed had worked with this particular informant since 1998 and considered him to be credible. Detective Reed did not tell the informant why he needed the information. Detective Reed also consulted other potential sources of information including Officer Bethard with the Longview Police Department and Investigator Hall Reavis with the Gregg County Criminal District Attorney's Office. As a result of his research, Detective Reed developed an expert opinion as to what the term "pull a Carlos" meant: "It all boils down to basically doing a shooting. Now, I've gotten—it's either drive-by do a shooting, take care of a witness. It[] all comes around as shooting."

Appellant objected to Reed's testimony on Confrontation Clause grounds. The trial court overruled the objection and found that Reed was an expert qualified to testify as to the meaning of slang phrases including "pull a Carlos."

The State then called Reed to testify before the jury. Reed told the jury that he talked to the confidential informant and the two other individuals in law enforcement and they each said they were familiar with the term and its meaning. Reed then testified, without objection,[4] that in his expert opinion, "pull a Carlos" means "[t]o conduct a shooting of

---

[4] *Wright v. Quarterman*, 470 F.3d 581, 586–87 (5th Cir. 2006) (noting that Texas law generally requires defendant to make a specific Confrontation Clause objection to preserve such error); *Lucio v. State*, 351 S.W.3d 878, 909 (Tex. Crim. App. 2011) (concluding that defendant's objections failed to alert trial court to any claim that State's presentation of certain evidence violated her Sixth Amendment right to confront witnesses against her and, thus, failed to preserve such claims for appellate review); *Davis v. State*, 313 S.W.3d 317, 347 (Tex. Crim. App. 2010) (holding that Confrontation Clause claims are subject to preservation requirements under Texas Rule of Appellate Procedure 33.1(a)(1)(A)); *Paredes v. State*, 129 S.W.3d 530, 535 (Tex. Crim. App.

some sort." The jury convicted Appellant of aggravated robbery and sentenced him to twenty-five years' confinement.

## COURT OF APPEALS

On appeal, Appellant argued that Reed's testimony about the meaning of "pull a Carlos" violated the Confrontation Clause. The Sixth Court of Appeals agreed, finding that under the circumstances of this case, disclosure of the out-of-court statements underlying Reed's opinion constituted the use of testimonial statements in violation of the Confrontation Clause. The appellate court found that the statement was procured specifically for use against Appellant at trial and was offered solely for the truth of the matter asserted—that to "pull a Carlos" means to shoot someone. This information was directly relevant to the State's theory of Appellant's consciousness of guilt. The court also held that the State failed to show the statement was reliable, that it was firmly rooted in a hearsay exception, that the source was unable to testify, and on what basis he had reached the conclusion that "pull a Carlos" meant to shoot someone. Finally, the court found, Reed merely recited what he had learned from the cooperating source and adopted those statements as his own. The court expressed concern that "allowing a witness to simply parrot . . . out-of-court testimonial statements directly to the jury in the guise of expert opinion would provide an end run around *Crawford*, and this we are loath to do." *Allison*

---

2004) (holding that defendant "failed to preserve error on Confrontation grounds" by failing to assert that objection at trial); *Briggs v. State*, 789 S.W.2d 918, 924 (Tex. Crim. App. 1990) ("We hold that in failing to object at trial, [defendant] waived any claim that admission of the videotape violated his rights to confrontation and due process/due course of law.").

*v. State*, No. 06-20-00020-CR, 2021 WL 5345133 at \*12 (Tex. App.—Texarkana Nov. 17, 2021) (internal quotation marks omitted) (quoting *Johnson v. State*, Nos. 05-09-00494-CR & 05-09-00495-CR, 2011 WL 135897, at \*4 (Tex. App.—Dallas Jan. 18, 2011, no pet.) (not designated for publication) (discussing *Crawford v. Washington*, 541 U.S. 36 (2004)).

## STATE'S PETITION FOR DISCRETIONARY REVIEW[5]

The State's petition for discretionary review presents novel grounds involving the intersection of Rule 703 and the Confrontation Clause. All three grounds involve the testimony of Detective Reed and his testimony that "pull a Carlos" means to "do a shooting." We will first address whether expert witnesses testifying on subject matters within the soft sciences based on knowledge and experience are required to perform the same level of independent testing or analysis of any hearsay information that forms the basis of their opinion as is required of expert witnesses testifying to subject matters within the hard sciences.

## LAW & ANALYSIS

In its first ground, the State relies on *Williams v. Illinois*, 567 U.S. 50, 70 (2012), arguing that the meaning of "pull a Carlos" was within Reed's personal knowledge at the

---

[5] This Court granted the following grounds on the State's petition for discretionary review:

(1) Once a witness learns the meaning of a phrase from other people is the meaning of that phrase thereafter part of the personal knowledge of the witness which the witness can then testify to without violating the Confrontation Clause?

(2) Are non-hard science expert witnesses required under the Confrontation Clause to perform the same level of independent testing/analysis required of hard science expert witnesses before they can give an expert opinion based on hearsay evidence?

(3) Did the Court of Appeals err by finding harm from the admission of Detective Reed's testimony?

time he testified and that there is no Confrontation Clause violation when a witness testifies to facts within their personal knowledge.

In *Williams*, the defendant challenged a laboratory expert's testimony that a DNA report from a prior kidnapping, rape, and robbery—which was not introduced into evidence—matched a DNA sample taken from the defendant upon his arrest on unrelated charges. In a decision authored by Justice Alito, a plurality found there was no Confrontation Clause violation where the report was not offered for its truth, but for the limited purpose of explaining the basis for the assumptions underlying the expert's independent conclusion that the samples matched. Even if the expert report was admitted for its truth, Justice Alito wrote, the report was not testimonial. *Williams*, 567 U.S. at 79 (plurality opinion). The five other justices in two opinions (Justice Thomas, concurring in the judgment, and Justice Kagan, joined by three other justices, dissenting) expressed the position that the report was offered for its truth. *Id.* at 103, 132 (Thomas, J., concurring) (Kagan, J., dissenting). Those opinions differed, however, in that while Justice Thomas found the report was not testimonial in nature, the dissenting justices found it was. *Id.* at 111, 134 (Thomas, J., concurring) (Kagan, J., dissenting).

While the instant case and *Williams* are similar in that both cases involve testifying experts who based their opinions on out-of-court statements that were not admitted into evidence, *Williams* is of limited help as a nonbinding plurality opinion. Therefore, in our analysis of a witness's personal knowledge as it relates to the Confrontation Clause, we turn to Texas Rule of Evidence 703 and *Crawford v. Washington*.

Texas Rule of Evidence 703

In its second ground, the State argues that the Confrontation Clause is not violated where an expert bases his opinion on inadmissible hearsay because that testimony is expressly permitted by Rule of Evidence 703. Further, it argues that the appellate court's holding that Reed's testimony was not "based on his own testing and/or analysis" and was simply a "parrot" of out of court statements effectively required Reed (a non-scientific expert) to conduct scientific testing before he could give an expert opinion. The State complains that, in so holding, the court of appeals erroneously relied on cases involving hard science expert witnesses testifying about matters readily subject to independent scientific testing or analysis which is very different from the instant case involving an expert testifying about linguistics and slang usage. The latter is a subject in which conclusions are based on experience and training rather than formulaic scientific methods.

Rule 703 provides: "[a]n expert may base an opinion on facts or data that [he] has personally observed. If experts in [his] field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted." TEX. R. EVID. 703. Thus, the requirement of personal knowledge does not apply to expert witnesses whose opinions and conclusions are reasonably based on facts or data generally relied upon by experts in the particular field. *Id.* at 602, 703.

In *Kelly v. State*, we presented the standard for determining whether an expert's scientific opinion was reliable: (a) the underlying scientific theory must be valid; (b) the technique applying the theory must be valid; and (c) the technique must have been properly

applied on the occasion in question. 824 S.W.2d 568, 573 (Tex. Crim. App. 1992). Rule 702 is not just limited to hard science experts, however. It also allows expert testimony as to soft sciences and fields based primarily upon experience and training as opposed to scientific methods. *See Nenno v. State*, 970 S.W.2d 549, 561 (Tex. Crim. App. 1998), *overruled on other grounds by State v. Terrazas*, 4 S.W.3d 720 (Tex. Crim. App. 1999) (en banc) (disapproving of *Nenno*'s holding that Texas Code of Criminal Procedure article 38.22 applies only to custodial statements). *Nenno* recognized that soft science or non-scientific expert testimony is held to a less rigorous standard than hard science expert testimony. Specifically, we held:

> The appropriate questions are: (1) whether the field of expertise is a legitimate one, (2) whether the subject matter of the expert's testimony is within the scope of that field, and (3) whether the expert's testimony properly relies upon and/or utilizes the principles involved in the field.

*Nenno*, 970 S.W.2d at 561. *Kelly* is therefore confined to the evaluation of scientific expert testimony. Because Detective Reed's testimony constitutes specialized knowledge of law enforcement, not scientific knowledge, the *Kelly* standards for admission do not apply.

Application of *Nenno*

Applying the 'soft' science analysis of *Nenno*, we hold that the trial court did not err in finding Detective Reed is an expert permitted to testify regarding the definition of "pull a Carlos."

*(1) Whether the field of expertise is a legitimate one*

While this Court has not specifically held that slang interpretation is a legitimate field of expertise, multiple circuit courts have. *See United States v. Hankey*, 203 F.3d 1160, 1169

(9th Cir. 2000) (holding "[t]his type of street intelligence might be misunderstood as either remote. . . or hearsay. . . , but FRE 702 works well for this type of data gathered from years of experience and special knowledge."); *see also United States v. Griffith*, 118 F.3d 318, 321 (5th Cir. 1997); *see also United States v. Delpit*, 94 F.3d 1134, 1145 (8th Cir. 1996); *see also United States v. Quintana*, 70 F.3d 1167, 1170–71 (10th Cir. 1995); *see also United States v. Boissoneault*, 926 F.2d 230, 232 (2nd Cir. 1991); *see also United States v. Rollins*, 862 F.2d 1282, 1292 (7th Cir. 1988); *see also United States v. Hoffman*, 832 F.2d 1299, 1310 (1st Cir. 1987). Importantly, Appellant does not challenge whether slang translation is a legitimate field, only that Detective Reed does not qualify as a slang expert.

*(2) Whether the subject matter of the expert's testimony is within the scope of that field*

Detective Reed was qualified to testify on this subject matter based upon his experience and training in that he (1) had been employed with the Longview Police Department for about twenty-eight years, (2) dealt mostly with narcotics and gang-related crimes, while also executing warrants and gathering intelligence, (3) dealt with many informants and was familiar with both victims and suspects involved in the narcotics trade, (4) was familiar with the connection between drugs and other crimes, and (5) had significant knowledge of other slang terms. While defense counsel objected that he had no formal training in slang, we are not persuaded that Reed's extensive experience working in large-scale drug and gang organizations left him unqualified as a slang expert.

*(3) Whether the expert's testimony properly relies upon and/or utilizes the principles involved in the field*

As Don Vito Corleone so aptly remarked, "I have learned more on the streets than in any classroom." THE GODFATHER (Paramount Pictures 1972). Detective Reed did not attend a formal course or training in drug and gang linguistics, if such courses exist. Reed stated that there had been occasions when he might not be familiar with a particular name, term, event, or situation. If that happened, Reed would contact somebody in the field, specifically, other police agencies or "somebody that knows somebody and their informant knows somebody in between" and then locate "somebody close to let [them] know what's going on." Asking others in the same field what a word means (either by consulting a dictionary, consulting an urban dictionary, or asking someone with direct knowledge) is one of the prevailing methods for learning what a word means. Detective Reed gave examples of several slang terms that might be outside a layperson's vernacular, such as "one plug," (a source of information); "ice," (methamphetamine); "eight ball," (three and one-half grams); "teenager," (sixteenth of a gram); "ice cream," (methamphetamine); "hard and soft," (crack cocaine and powder cocaine); and "wet," (PCP). Detective Reed has learned the meaning of these slang drug terms over the course of conversations with others in the field. An officer's knowledge of the jargon in drug trade and gang activities is critical to criminal investigations. It is unclear how one is to obtain personal knowledge of the terminology without asking trusted sources within the trade.

We therefore find Detective Reed's 'soft' science testimony permissible. Detective Reed may not have performed scientific testing on the meaning of the phrase "pull a Carlos" (since no such scientific testing was possible), but he did follow a widely-accepted

course of action to determine what the phrase meant by consulting other law enforcement personnel and informants as to the meaning of "pull a Carlos." As a soft-science expert witness, Detective Reed should not be required to conduct scientific testing on the information that forms the basis of his expert opinion prior to testifying to his expert opinion.

We now turn to the appellate court's concern that cloaking inadmissible testimonial hearsay in the basis for an expert opinion allows a witness to simply "parrot . . . out-of-court testimonial statements directly to the jury in the guise of expert opinion [that] would provide an end run around *Crawford*." *Allison*, 2021 WL 5345133 at \*12 (mem. op.) (internal quotation marks omitted) (quoting *United States v. Lombardozzi*, 491 F.3d 61, 72 (2nd Cir. 2007)).

However, was Detective Reed "parroting" the out-of-court statements? The State argues that Detective Reed did not blindly "parrot" what someone told him, but reached a conclusion after evaluating several descriptions and synthesizing the information. Appellant argues that there was no such interpretation here, but rather wholesale repetition of statements from the confidential informant and law enforcement personnel. We disagree.

First, to analyze information is to "study or determine the nature and relationship of the parts of something," or "to subject to scientific or grammatical analysis." *Analyze*, MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/analyze (last visited December 1, 2022). In this case, an expert conducted research in his particular field in order to interpret the phrase "pull a Carlos." Reed consulted with four people: one

who did not know what the phrase meant, and three others that said the phrase meant to do a shooting, to do a drive-by shooting, or "to take care of a witness."[6] These responses were not identical. After consulting with the sources, Detective Reed synthesized this information and concluded that "pull a Carlos" meant to "do a shooting." Reed did not blindly recite what someone else told him, but rather investigated the meaning of the phrase and only came to a conclusion after consulting a range of sources (including a source he has known since 1998) to feel confident in his conclusion.

Secondly, requiring a "proving up" of street slang would be an inquest into perpetuity. For example, if Appellant were to call the confidential informant and Officers Bethard and Reavis as witnesses, what would prevent Appellant from demanding those witnesses produce the origins for their definition of the phrase?[7] Appellant's request to

---

[6] His testimony was, "It all boils down to basically doing a shooting. Now, I've gotten—it's either drive-by do a shooting, take care of a witness. It's[sic] all comes around as shooting."

[7] It is worth noting that nothing in the record indicates that Appellant was prevented from calling any additional out-of-court declarants. To the contrary, Hall Reavis, Investigator with the District Attorney's Office, did in fact testify. In a hearing outside the presence of the jury, Reavis testified that, in preparation for this case and the companion cases, he personally downloaded the jail call at issue. During a trial prep conference with the trial prosecutor, Chris Bethard with the Longview Police Department, came by the office. While the prosecutor and Reavis were discussing the phrase 'pull a Carlos,' Bethard "out of the blue says, oh, that means to do a shooting."

Reavis then testified that while investigating an unrelated case, the same prosecutor and Reavis were interviewing an inmate and Reavis asked the inmate if he ever heard of the phrase to pull a Carlos. According to Reavis, the inmate immediately said the phrase meant to put a hit on a witness or to shoot a witness to prevent someone from testifying. The State then made the name of the inmate available to the defense and the trial court told defense counsel he could subpoena this witness for trial. There is nothing in the record to indicate that this witness was unavailable.

As for Bethard, there is also nothing in the record to indicate that he was unavailable for defense counsel to fully cross-examine. Bethard was listed as a State's witness, but it does not appear he

cross-examine the primary and secondary witnesses to prove up a definition of a word could extend to a tertiary level and beyond. How would the court determine a reasonable limit for such an expedition? While we recognize the appellate court's concern about using an expert to "work around" the Confrontation Clause, it is judicially inefficient to require a "proving up" of street slang. In the field of slang linguistics, it is most practical to gauge the reliability of an expert opinion under a 'soft' science standard found in *Nenno*.

The Confrontation Clause

Rule 703 and judicial economy aside, we now turn to whether Reed's testimony was a violation of Appellant's right to confront witnesses. We hold that there was no Confrontation Clause violation as his conclusion was non-testimonial and the jury heard only the direct, in-court testimony of Detective Reed.

In *Crawford v. Washington*, the Supreme Court held that the Sixth Amendment confrontation right applies not only to in-court testimony, but also to out-of-court statements that are testimonial in nature. 541 U.S. at 51. The Confrontation Clause forbids the admission of testimonial hearsay unless the declarant is unavailable to testify and the defendant had a prior opportunity to cross-examine the declarant. *Id*.

The first step in a Confrontation Clause analysis is to determine whether the statement at issue was testimonial or non-testimonial. In *Crawford*, the Supreme Court drew a distinction between the two categories, although it did not explicitly define what is

---

was called by the State to testify at Appellant's trial. However, the record before us does not indicate that defense counsel was not able to confront Bethard due to unavailability.

considered testimonial and what is not. *Id.*; *see Burch v. State*, 401 S.W.3d 634, 637 (Tex. Crim. App. 2013) ("While the exact contours of what is testimonial continue to be defined by the courts, such statements are formal and similar to trial testimony.").

The *Crawford* Court stated that "testimony" is "[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact." *Crawford*, 541 U.S. at 51. According to the Supreme Court, an accuser making a formal statement to government officials bears testimony in a sense that a person making a casual remark to an acquaintance does not. *Id*. As examples of testimonial statements, the *Crawford* Court lists affidavits, custodial examinations, depositions, prior testimony, confessions, or similar pretrial statements that declarants would reasonably expect to be used in a prosecution. The Supreme Court also refers to statements that were made under circumstances leading an objective witness to reasonably believe the statement would be available for use at a later trial. *Id*. at 52.

On the other hand, the Sixth Amendment does not bar the admission of non-testimonial hearsay. *Id*. "An off-hand, overheard remark might be unreliable evidence and thus a good candidate for exclusion under hearsay rules, but it bears little resemblance to the. . . abuses the Confrontation Clause targeted." *Id*. at 51.

*Was the statement "[t]o conduct a shooting of some sort" testimonial in nature?*

In general, a statement is testimonial if a reasonable person would have understood that law enforcement officers were conducting a criminal investigation and collecting

evidence for the purpose of prosecution. *See Wall v. State*, 184 S.W.3d 730, 745 (Tex. Crim. App. 2006).

Detective Reed testified that he was familiar with slang words due to his work in the narcotics trade. He testified that if he ran across a slang term that he was not familiar with, he would ask informants or sources what the term meant. Following this procedure in the instant case, Reed asked four individuals if they were familiar with the phrase "pull a Carlos." Reed did not give a context for the phrase or otherwise tell his sources why he was asking, nor is it apparent that any of the consultants were otherwise familiar with the facts of this case. An informant that Reed has known since 1998 immediately told him what the term meant. Likewise, a police officer and an investigator with the DA's office separately gave their interpretations of the term which were consistent with the meaning given by the confidential informant. A fourth source did not know what the term meant.

None of the four individuals, while speaking with Detective Reed, were told that Reed was inquiring about the meaning of to "pull a Carlos" as part of an investigation. Instead, it was likely that the sources believed the detective was simply trying to expand his slang-term vocabulary by establishing the meaning of some phrase that he recently heard. Nor did any of the four individuals have any expectation that his statement would be of later use to accuse a defendant of a crime, as he spoke informally and without coercion. A reasonable person would not expect that simply because a law enforcement officer asks them the meaning of a certain phrase that that question was asked in order to conduct a criminal investigation or collect evidence for purpose of prosecution.

Accordingly, any definition of the term "pull a Carlos" that was relayed by the confidential informant or law enforcement personnel to Detective Reed was a non-testimonial statement. The rule in *Crawford* is therefore inapplicable because the statements were not testimonial in nature. The trial court did not err in allowing Detective Reed to testify as to the meaning of the phrase "pull a Carlos."

*Did Detective Reed testify as to any out of court statements?*

As discussed above, Texas Rule of Evidence 703 allows an expert to base his or her opinion on inadmissible hearsay. TEX. R. EVID. 703. This is because the testifying expert's opinion is not itself hearsay and the testifying expert is available for cross-examination. In this case, Appellant had the opportunity to, and did in fact, cross-examine Detective Reed.

Further, Detective Reed did not disclose the hearsay upon which his own opinion was based. Detective Reed never testified before the jury as to what the confidential informant and Officers Bethard and Reavis said specifically. Therefore, no out-of-court statements were admitted at trial. Instead, the jury heard only the direct, in-court testimony of Detective Reed that he spoke to some sources and then gave his own opinion of what the phrase "pull a Carlos" meant. Accordingly, Detective Reed was the person "bearing witness" against Appellant—not the people whom the Detective claimed made the original statements. Because he was available for confrontation and cross-examination, the requirements of the Confrontation Clause were satisfied.

Harm analysis

Even if the trial court erred in allowing Officer Reed to testify as to the meaning of the phrase "pull a Carlos," Appellant was not harmed by its admission.

*Standard of review*

We review constitutional error in the admission of testimonial statements in violation of the Confrontation Clause under the standard specified in Rule 44.2(a) of the Texas Rules of Appellate Procedure. *Clay v. State*, 240 S.W.3d 895, 904 (Tex. Crim. App. 2007); *see* TEX. R. APP. P. 44.2(a). Constitutional error requires reversal of the judgment "unless the court determines beyond a reasonable doubt that the error did not contribute to the conviction or punishment." TEX. R. APP. P. 44.2(a).

The following factors are relevant to our analysis: (1) the importance of the out-of-court statement to the State's case; (2) whether the out-of-court statement was cumulative of other evidence; (3) the presence or absence of evidence corroborating or contradicting the out-of-court statement on material points; and (4) the overall strength of the State's case. *Scott v. State*, 227 S.W.3d 670, 690 (Tex. Crim. App. 2007).

The emphasis of the harm analysis under Rule 44.2(a) is not on the propriety of the outcome of the trial. *Id.* In other words, the question is not whether the jury's verdict was supported by evidence, but whether it is likely that the constitutional error was actually a contributing factor in the jury's deliberations. *Id.* That is, whether the error adversely affected the integrity of the process that led to the conviction. *Id.*

In analyzing harm, we may consider, in addition to the factors listed above and without limitation, the source and nature of the error, the extent, if any, the error was

emphasized by the State, and how much weight the jury might have placed on the erroneously admitted evidence compared to the remainder of the evidence as to the relevant element or defensive issue. *Id.* We must ask whether there is a reasonable possibility that the error moved the jury from a state of non-persuasion to one of persuasion on a particular issue. *Id.* Ultimately, we must be satisfied, to a level of confidence beyond a reasonable doubt, that the error did not contribute to the conviction to conclude that the error was harmless and affirm. *Scott*, 227 S.W.3d at 690.

A plurality of the court of appeals determined that the erroneous admission of Officer Reed's testimony was harmful constitutional error requiring reversal. *Allison*, 2021 WL 5345133 at *14. Justice Burgess's concurrence would dispense with the harm analysis in its totality since the State did not brief the issue. *Id.* at *18. The dissent, however, conducted a harm analysis and would have held the admission of Detective Reed's statements harmless. *Id.* at *19.

*Error was harmless*

The meaning of the phrase "pull a Carlos" was offered during Detective Reed's testimony. Excluding Reed's testimony, the State had a strong case against Appellant based on the testimony of the complainant, Jose Jimenez, who gave a physical description of the masked individual who robbed him, consistent with Appellant's height, build, race, and age. The State also put on the testimony of accomplice witness, R.J., who directly testified to Appellant's participation in the aggravated robbery and confirmed that Appellant was the only robber who wore a mask. Further, it introduced and the recorded jail call between

Appellant and his accomplice, T.K. in which they discussed the charged aggravated robbery offense in terms that implicated them to the offense (referred to the complainant by his first name, discussed the complainant being shot in the head, etc.). This evidence weighs heavily against a conclusion that Appellant was harmed by Detective Reed's testimony that the term "pull a Carlos" meant to conduct a shooting.

The evidentiary value from Detective Reed's testimony was slight as it related to an extraneous offense. In fact, the State's own witnesses, Detective Armando Juarezortega, testified that the State did not have probable cause to link the second Clearwood house shooting to a specific suspect. The trial court instructed the jury with a limiting instruction and again in the jury charge that they could not consider this extraneous offense for any purpose unless they were convinced beyond a reasonable doubt that Appellant committed the second shooting at the Clearwater House. It is generally presumed that a jury follows the trial court's instructions. *Colburn v. State*, 966 S.W.2d 511, 520 (Tex. Crim. App. 1998). There is no evidence the jury did not follow the trial court's instructions regarding the extraneous offenses, so we presume the jury did follow the trial court's instructions.

Based on the foregoing, we are confident that the verdict was not attributable to Detective Reed's opinion as to what "pull a Carlos" meant. After carefully reviewing the record, we hold that any error in the admission of Detective Reed's opinion of the phrase did not contribute to appellant's conviction or punishment and was harmless beyond a reasonable doubt. *See* TEX. R. APP. P. 44.2(a).

## CONCLUSION

We find that under the less-rigorous 'soft' science standards, Detective Reed properly offered expert witness testimony concerning the meaning of a term of gang slang. We further find the Confrontation Clause was not implicated in this case for two additional reasons. First, the out-of-court statements were non-testimonial in nature. Second, no out-of-court statement was admitted at trial. Finally, we find that any error in admitting the testimony was harmless. Because the court of appeals held otherwise, we reverse and affirm the judgment of the trial court.

Delivered: April 19, 2023

Publish